IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION


TERRY GALE PLUNK                                        PETITIONER
ADC #139430

V.                         NO.  5:08cv00203 SWW-JWC

RAY HOBBS, Director,                                    RESPONDENT
Arkansas Department of Correction


## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

## INSTRUCTIONS

The following recommendations have been sent to United States District Judge Susan Webber Wright.  Any party may serve and file written objections to the recommendations.  Objections should be specific and should include the factual or legal basis for the objection.  If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection.  An original and one copy of your objections must be received in the office of the United States District Court Clerk within fourteen (14) days after being served with the findings and recommendations.  The copy will be furnished to the opposing party.  Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendations and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include a "Statement of Necessity" that sets forth the following:

1.      Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence to be proffered at the requested hearing before the District Judge was not offered at a hearing before the Magistrate Judge.

3.      An offer of proof stating the details of any testimony or other evidence (including copies of any documents) desired to be introduced at the requested hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A149
Little Rock, AR 72201-3325

## RECOMMENDATIONS

Terry Plunk, an Arkansas Department of Correction (ADC) inmate, brings this 28 U.S.C. § 2254 petition for writ of habeas corpus challenging his 2007 state-court convictions and seventy-two-year imprisonment term.  He advances two broad claims:

1.      His state-court attorney labored under an actual conflict of interest in representing Petitioner, his girlfriend (Deborah Devries), and his son (Nathan Plunk), which resulted in the violation of his right to conflict-free counsel under the Sixth and Fourteenth Amendments; and

2.      His right to the effective assistance of counsel under the Sixth and Fourteenth Amendments was violated.

Respondent asserts the defenses of statute of limitations and procedural default, and alternatively argues that Petitioner's claims are without merit.

On July 12, 13 and 14, 2011, the Court held an evidentiary hearing.  Petitioner appeared with his appointed counsel, Federal Public Defenders Joshua Lee and Julie Pitt,

and Respondent appeared through Arkansas Assistant Attorneys General Lauren Heil and

Christian Harris.  Counsel stipulated to the admissibility of Joint Exhibits 1-23, Petitioner's

Exhibits 1-27 and 33-39, and Respondent's Exhibits 1-49.  Thus, without objection, all of

these exhibits were received into evidence.[1]

Testimony was received from: (1) Petitioner; (2) Ms. Devries; (3) Petitioner's state-

court attorney, Phillip Moon; (4) Christopher Carter, a deputy prosecuting attorney for the

Fourteenth Judicial District of Arkansas, which includes Boone County; (5) Wes Bradford,

also a Fourteenth Judicial District deputy prosecuting attorney assigned to Boone County

at the relevant time; (6) Dale G. Watson, Ph.D., a clinical and forensic neuropsychologist

who assessed Petitioner at his counsel's request in connection with these federal habeas

proceedings; (7) Roger B. Moore, Jr., Ph.D., who assessed Petitioner at Respondent's

request in connection with these proceedings; (8) Robert Hall, an ADC inmate who has

assisted Petitioner with his legal proceedings; and (9) Brad Abbott, a special agent with the

Drug Enforcement Administration (DEA)

Both parties submitted pre-hearing and post-hearing briefs (docs. 159, 166, 171,

174, 175, 181, 182).  This matter is ready for final disposition.

---

[1]I excluded Petitioner's Exhibits 28-32, which are documents related to disciplinary proceedings against Petitioner's state-court attorney before the Arkansas Supreme Court Committee on Professional Conduct.  (Hearing Tr. Vol. 1, at 180-90.)  An attorney's disciplinary or licensing problems, or his breaches of any ethical duties, are insufficient by themselves to establish ineffective assistance of counsel. *Mickens v. Taylor*, 535 U.S. 162, 176 (2002); *Noe v. United States*, 601 F.3d 784, 791 (8th Cir. 2010).  Petitioner argued that prior disciplinary actions would give trial counsel a motive to falsify his testimony because of the cumulative effect of disciplinary sanctions and would be admissible as tending to show bias.  However, I find the excluded exhibits have little, if any, probative value as to credibility.

# I.
# BACKGROUND

The Court makes the following findings of fact based on the hearing testimony and exhibits.

## A.    Factual Background.

In April 2006, law enforcement officers in Boone County, Arkansas, received several reports that Petitioner was in possession of a substantial amount of methamphetamine. They began surveillance of Petitioner's mother's property in Omaha, Arkansas, where he and his girlfriend, Ms. Devries, resided.  According to sources, Petitioner kept most of the drugs in a recreational vehicle that he owned and kept parked on the property.

On April 24, 2006, at about 6:30 p.m., Petitioner left the residence in his truck, and officers began to follow him.  According to police reports, Petitioner crossed the center line and began traveling at a high rate of speed.   The officer behind him activated his emergency lights and siren.  Instead of stopping, Petitioner increased his speed and began throwing onto the roadway ziplock bags of methamphetamine.   The pursuit continued across the state line into Missouri, back into Arkansas, then into Missouri again.  For about an hour, Arkansas and Missouri officers were unable to stop Petitioner with vehicle maneuvers, roadblocks and spike strips.  During the pursuit, Petitioner ran stop signs and stop lights, crossed the median into oncoming traffic, passed on blind curves and no-passing zones, rammed police vehicles, sped through busy intersections, and wove through a crowded shopping center parking lot.   Eventually, an Arkansas State Police trooper (Corp. Carey Lovaas) ended the pursuit with a PIT (patrol immobilization technique) maneuver in Branson, Missouri.  Officers reported that, because Petitioner would not exit

the vehicle, they had to break both the passenger's and driver's windows, then use a "taser" gun to extract him.  They reported seizing a loaded .45 caliber pistol magazine, approximately $1200 in cash, and methamphetamine from Petitioner's pocket.  His truck was impounded.  Approximately four grams of methamphetamine was recovered from the roadways along the pursuit route.[2]  A significant portion of the high-speed pursuit was video-recorded by Corp. Lovaas, and this recording was introduced into evidence and viewed by the Court during the habeas hearing.[3]

Early the next morning, officers executed a search warrant at Petitioner's mother's residence and Petitioner's recreational vehicle parked on the property.  From the residence, they seized empty ziplock bags, a loaded .45 caliber pistol, a shotgun, a scanner, and drug paraphernalia.  From the recreational vehicle, they seized additional firearms, electronic scales, other drug paraphernalia, and ledger sheets.  Ms. Devries was arrested on the property, with three grams of methamphetamine in her purse.[4]

On May 2, 2006, Missouri officers received a tip that drugs were hidden in the engine compartment of Petitioner's impounded truck.  They conducted a canine sniff and search of the truck, reporting that they found methamphetamine totaling approximately 1.3 pounds, or 579 grams.[5]

As a result of the chase and the drugs and other items seized from his truck and

_____

[2]Resp't Ex. 13-17 (police reports); *see also* Joint Ex. 21, at 269, 355-56.

[3]Resp't Ex. 49.

[4]Resp't Ex. 18, 19 (search warrant returns); *see also* Resp't Ex. 16, at 2; Joint Ex. 21, at 220-23, 258-59, 355-56.

[5]Resp't Ex. 13, 20; Joint Ex. 21, at 211 (police reports).

residence, Petitioner was charged in Boone County Circuit Case No. CR 2006-129-3 (*Plunk 1*) with possession of methamphetamine with intent to deliver, simultaneous possession of drugs and firearms, being a felon in possession of a firearm, fleeing in a vehicle, three counts of criminal mischief (damage to police vehicles), possession of drug paraphernalia, aggravated assault, possession of marijuana, and being subject to a sentencing enhancement due to a prior drug-related conviction.[6]   While still detained in Missouri, he retained Mr. Moon to represent him.   Petitioner was later extradited to Arkansas, and, on June 23, 2006, counsel negotiated his release on a $15,000 bond.[7]

Based on what was found in the residence and recreational vehicle, Ms. Devries was charged, in Boone County Circuit Case No. CR 2006-99-3, with possession of methamphetamine with intent to distribute, simultaneous possession of drugs and firearms, hindering apprehension or prosecution, possession of drug paraphernalia, and possession of a narcotic drug.[8]   She was represented by a public defender until July 12, 2006, when Mr. Moon entered an appearance on her behalf.[9]   He had been retained by Petitioner to represent Ms. Devries on her charges.

While on bond awaiting trial on the April offenses, Petitioner was arrested again on August 28, 2006, for attempting to deliver methamphetamine to an undercover police officer at an agreed location for a price of $11,500.  The transaction was arranged with the

---

[6]Resp't Ex. 2-4 (the original information dated April 26, 2006, as amended on January 30, 2007, and February 5, 2007).

[7]Joint Ex. 5, at 2-4; Joint Ex. 9.

[8]Resp't Ex. 30, 31; Pet'r Ex. 20A.

[9]Resp't Ex. 33.

help of a confidential informant.  As officers moved in toward the car that Petitioner was driving, he began to back out of the parking space.  Believing he was about to be hit, an officer (Sgt. David Orsborn) standing at the rear of the car fired into Petitioner's car, wounding him in the shoulder.  Petitioner was arrested.  Officers seized 34.4 grams of methamphetamine from his socks and, from his car, 338.9 grams of methamphetamine, a glass pipe, digital scales, and plastic baggies.[10]  Petitioner was subsequently charged in Boone County Circuit Case No. CR 2006-213-3 (*Plunk 2*) with criminal attempt to commit capital murder, possession of methamphetamine (a total of 373.3 grams) with intent to deliver, attempt to deliver methamphetamine, possession of drug paraphernalia, and being subject to sentencing enhancement due to prior convictions.[11]

Later in the afternoon on August 28, 2006, officers with the Fourteenth Judicial District Drug Task Force went to Petitioner's mother's house.  At that time, they took a statement from Ms. Devries. According to the investigative report,[12] Ms. Devries said the "meth stuff" started about a year and a half ago, that they were supplied about one to two pounds per week from Marty Matzenauer and "Trara Holt a/k/a Janis,"[13] that Petitioner had said a few days earlier he was going to get methamphetamine from their supplier, and that he was gone for about nine hours and returned with one pound of methamphetamine.

---

[10]Joint Ex. 21, at 113-17, 303-20, 340-62, 432-42 (police reports and affidavits).

[11]Resp't Ex. 7, 8 (the original information dated August 31, 2006, as amended on May 4, 2007).

[12]Joint Ex. 19.  Ms. Devries' statement is recounted on the third page.

[13]The exhibits in the record refer to a Ms. Holt and to a Janice McTyer.  Some references appear to be to the same person, while others appear to be to separate individuals.  (*See* Resp't Ex. 13, at 1,5; Joint Ex. 22, at 76-84.)  Where the evidence is unclear, I have referred to the individual as Ms. Holt/McTyer.

According to the report, Ms. Devries also said that when Petitioner went to Little Rock to get the drugs he went directly to the supplier's house but that sometimes the supplier would travel to the Omaha/Branson area to deliver to Petitioner and others.  The report further states that Ms. Devries "agreed to meet with the prosecutor and restate her confession." There is no evidence that she gave any further relevant statements to law enforcement or the prosecuting attorney, or cooperated with them in any way.

At some point, Mr. Moon was also retained to represent Petitioner's son, Nathan Plunk, on charges not directly related to any of Petitioner's challenged convictions or to the events of April 24 or August 28, 2006.[14]

### B.   **Trial and Plea Proceedings.**

Along with the numerous lesser offenses, Petitioner was charged with four Y felonies, the most serious under Arkansas law, each carrying the possibility of a life sentence: (1) from the April arrest, possession of methamphetamine with intent to deliver, based on the drugs he threw out of his vehicle during the pursuit (4 grams) and those later found in his truck (579 grams); (2) from the April arrest, simultaneous possession of drugs and firearms; (3) from the August arrest, criminal attempt to commit capital murder based on the allegation that Petitioner tried to run over the officer; and (4) from the August arrest, possession of methamphetamine with intent to deliver, based on the drugs he tried to sell to the undercover officer (373.3 grams).  Under Arkansas law, possession of more than 200 milligrams of methamphetamine creates a rebuttable presumption that the person possesses the substance with intent to deliver.  Ark. Code Ann. § 5-64-401(d)(3)(A)(ix).

---

[14]Resp't Ex. 40-47.

Petitioner was also subject to extended terms of imprisonment under Arkansas law as an habitual offender with more than four prior felony convictions, as well as a prior drug-related conviction.[15]  *See id.* § 5-4-501(b) (authorizing extended terms for defendants with four or more felony convictions), § 5-64-408 (allowing doubling of authorized imprisonment term for persons convicted of a second or subsequent drug-related offense).

According to attorney Moon's testimony in the habeas hearing, Petitioner's cases were "a big deal" to the prosecutors and law enforcement because Petitioner had fled from the police in an extended and dangerous high-speed chase in the April offenses, committed the August offenses while out on bond, and was accused of "trying to kill one of their own," by attempting to back over Sgt. Orsborn.   He said the prosecution's attitude toward Petitioner's cases was "like a dog with rabies."   Defense counsel and the prosecutors considered the attempted capital murder to be the most serious charge.   I find the testimony of counsel and the prosecutors to be credible in this regard.

Counsel said he felt the April charges would be "very difficult" to defend and, if Petitioner were convicted, he would have even more prior convictions for enhanced sentencing purposes.  Additionally, the prosecution had the video of the high-speed pursuit, which counsel knew would be inflammatory.   He said Petitioner knew the April charges were "a bad deal," that the video would create problems, and that the police were "mad as hornets" due to the chase and damage to three police vehicles.

---

[15]Petitioner had prior felony convictions for stealing, possession of drug paraphernalia, possession of a firearm by certain persons, and two counts of theft by receiving, and prior misdemeanor convictions for possession of marijuana, DUI and traffic violations.  (Resp't Ex. 12.)

As to the August offenses, counsel thought the drug charges by themselves would be a "hard, hard case to defend" but felt strongly that the most serious charge, attempted capital murder, was "very defensible."  According to counsel, Petitioner's attitude was that he should get some kind of concession on all his charges because "they shot me."  Overall, counsel felt the August case was more defensible and that it would be to Petitioner's advantage to try it first, not only with defending the charges, but also with sentencing. When the prosecutors decided to try the August charges first,[16] that is the case counsel "trained in on."

To prepare for trial, counsel said he reviewed a "mountain of material," including the charging informations and supporting affidavits, all police reports, all weapons and physical evidence, discovery responses, police diagrams, and photos.  He met with Petitioner shortly after he left the hospital and went over "every detail from his perspective," including the timing of events, the locations of the officers, and what Petitioner saw, heard and did. At that time, it was "all very fresh" to Petitioner.  Counsel interviewed Petitioner several more times, as well as Ms. Devries and Petitioner's mother.  He learned that Petitioner was visually impaired in one eye, and thought that would be important to his defense.

On July 23, 2007, the jury trial began on the August 2006 charges against Petitioner in *Plunk 2*.[17]  Counsel testified that, during the trial, he knew the prosecution had to prove that Petitioner took a substantial step toward capital murder of a police officer and that, due

---

[16]The deputy prosecutor at the time, Wes Bradford, said they made this decision because of the seriousness of the attempted capital murder charge.  There was also indication of some potential problems with obtaining witnesses from Missouri for the April case.

[17]Joint Ex. 4 is the transcript of Petitioner's trial, sentencing and plea proceedings in *Plunk 1* and *Plunk 2*.

to his preparation, he felt confident in his ability to cross-examine the state witnesses about discrepancies in the evidence and then to "hammer it home."  The trial transcript confirms that counsel's strategy focused on weaknesses in the evidence regarding Petitioner's intent to run over the officer.  For example, he vigorously attacked the credibility of the informant who arranged the undercover transaction and who had testified that Petitioner said they would kill the buyer if he turned out to be a cop and that, if the police showed up, Petitioner would do "whatever it takes to get away ... I'll run them over."  Counsel also carefully questioned the officers about their recollection of events and impeached their trial testimony with an audiotape, the written police reports, and photographs and diagrams.  Counsel pointed out inconsistencies in the testimony of the various officers and discrepancies between the officers' statements and what was heard on the audiotape.  He emphasized that events were rapidly unfolding, and pointed out evidence that Petitioner appeared to be braking rather than accelerating.  He elicited testimony that the officers were armed with "assault rifles," and suggested that the officers were "embellishing" their testimony to justify the shooting of Petitioner.  Counsel repeatedly emphasized through testimony and in his arguments that Petitioner had only one eye, never turned his head, and had his view of Sgt. Orsborn further obstructed by a headrest.

On the drug charges, counsel said he tried to test the credibility of what the undercover officer saw and hoped that the credibility problems of the other state witnesses would "permeate the rest of the case."  He also made a number of attempts to exclude state crime lab documentation, based on chain of custody, a discovery violation and a Confrontation Clause violation.  The lab report was admitted, but counsel was able to get some lab notes excluded.

At the close of the state's case, counsel moved for a directed verdict on all charges. which the court granted on the charge of attempted delivery of a controlled substance.[18]

After three days of testimony, the jury acquitted on the attempted capital murder charge, but convicted on the two remaining charges: possession of methamphetamine with intent to deliver, and possession of drug paraphernalia.  Counsel saw that the prosecution was setting up the projector to play the April chase video in the sentencing phase, and felt the judge would allow it.  He said he did not want the judge, jury or even spectators to see the video because he knew, if it were played, it would show a person "in total control" and "no doubt would have been devastating."  Having viewed the tape, I believe counsel's fears were justified.  Counsel also knew that Petitioner's prior convictions would be admissible in the sentencing phase.  He felt the jury would regret acquitting on the attempted capital murder charge, exposing Petitioner "to the max."

The deputy prosecutor (Wes Bradford) confirmed that, if sentencing had gone to the jury, he would have played the video and argued for a life sentence on the remaining charges based on the evidence, Petitioner's criminal history, and the fact that he was out on bond at the time of commission of the offenses.  According to Mr. Bradford, not only would the video have shown conduct that was "obviously egregious and reckless and dangerous," but it also would have clearly shown "somebody who can function quite well with one eye."  As Petitioner's counsel put it, the video would have made the defense look like "a bunch of liars."

---

[18]Counsel argued that Petitioner was subjected to double jeopardy because the attempted delivery charge was based on the same conduct as the charge of possession with intent to deliver.  The court, however, stated that it dismissed the attempted delivery as "inappropriately charged."  (Joint Ex. 4, at 516-23, 543-45.)

Faced with these prospects, counsel said he started trying to feel out the prosecutor to see if they could "work out a deal."  He said he could see in the faces of the prosecution team and law enforcement a "big letdown" due to the acquittal on what they considered to be the most serious charge.  He said he "caught them when they were down" and were willing to negotiate concessions.

One of counsel's stated goals in plea negotiations was to get the prosecution to agree to a term of years, rather than life imprisonment, to better his chances of getting the sentence commuted at some point.  It was also important to him to have Petitioner enter a plea to the April charges at the same time, rather than risk later convictions on those charges and the potential for consecutive sentences.  He knew the video would be played at any subsequent trial on the April charges and that prosecutors would "hammer it to the ninth degree" to get as much as possible, and he thought it would "turn into a complete volcano."

According to counsel, the prosecution started out with an offer of ninety years, which counsel was able to negotiate down to an aggregate sentence of seventy-two years, resolving all charges from both cases.  Under the negotiated plea agreement in *Plunk 2*, Petitioner would waive the right to have the jury sentence him, waive his right to an appeal, and agree, as an habitual offender, to a sentence of seventy-two years of imprisonment for possessing methamphetamine with intent to deliver, and a concurrent ten-year sentence for possessing drug paraphernalia.[19]  Under the plea agreement in *Plunk 1*, the state would *nolle pross* the Y felony charge of simultaneous possession of drugs and firearms,

---

[19]Resp't Ex. 9 (plea statement).

Petitioner would plead guilty to all other charges, and he would be sentenced as an habitual offender to an agreed imprisonment term of seventy-two years for possession of methamphetamine with intent to deliver, and concurrent lesser terms on the other offenses, all to be served concurrently with his sentences in *Plunk 2*.[20]

Counsel met privately with Petitioner to discuss the plea agreements.  Counsel testified that he went over the agreement paragraph by paragraph, reading it to Petitioner, explaining each provision, answering any questions, and having Petitioner initial each paragraph.

Petitioner and counsel then appeared before the trial judge.  On the *Plunk 2* convictions, Petitioner acknowledged to the court that he understood the matters set out in the plea statement, knew he was waiving his right to be sentenced by the jury on the charges for which he had just been convicted, knew he was waiving his right to testify at any sentencing hearing, knew he was pleading as an habitual offender, and was receiving the sentence that he understood he was going to get.[21]  On the April charges in *Plunk 1*, Petitioner acknowledged on the record that he understood the matters in the plea statement, understood the charges and range of possible penalties, knew he was potentially subject to greater penalties as an habitual offender, was pleading freely and voluntarily, knew he was giving up his right to a jury trial and to testify in his defense, knew he was giving up his right to an appeal, was not threatened or promised anything in

---

[20]Resp't Ex. 5 (plea statement).  The sentences on the lesser offenses were: ten years for each Class C felony (three counts of criminal mischief, possession of drug paraphernalia); six years for each Class D felony (possession of firearms by certain persons, fleeing in a vehicle, aggravated assault); and one year for misdemeanor possession of marijuana.

[21]Joint Ex. 4, at 586-92, 594.

exchange for his plea, and was pleading guilty because he was in fact guilty of the charges. The prosecutor recited in detail the factual basis for the April charges, and Petitioner and counsel both acknowledged that his recitation was correct.[22]

The trial court accepted the jury's guilty verdict and Petitioner's pleas, adjudged him guilty, and pronounced sentences in accordance with the plea agreements.  The trial judge further stated that, from his observation, counsel had "done a good job of representing" Petitioner, who apparently acknowledged that he was satisfied with his attorney's services.[23]

Judgments were entered in both *Plunk 1* and *Plunk 2* on July 27, 2007.[24]  As stated, as part of his plea agreement in *Plunk 2*, Petitioner expressly waived his right to appeal the jury verdicts or the sentence imposed.  By pleading guilty in *Plunk 1*, he waived his right to a direct appeal of those convictions or sentences under Arkansas law.  See Ark. R. App. P.-Crim. 1(a) (2007).  Petitioner did not file a petition for post-conviction relief in state court pursuant to Ark. R. Crim. P. 37 or any other provision.

When Ms. Devries arrived at Petitioner's trial, she was arrested on charges of furnishing prohibited articles and unlawful use of a communication device, for having brought prescription medication (Zanax) to him at the jail on July 14, 2007.[25]  On January 4, 2008, appearing with her retained counsel, Ms. Devries pleaded guilty to those charges, along with charges stemming from the April 2006 events.  She received a sentence of 120

---

[22]*Id.* at 592-600.

[23]*Id.* at 590-92, 600-02.

[24]Resp't Ex. 6, 10.

[25]Resp't Ex. 37, 38.

days in community correction and ten years of probation.[26]

C.    **Federal Habeas Proceedings**.

This Court received and file-stamped a *pro se* habeas petition from Petitioner on July 28, 2008 (doc. 2), a *pro se* amended petition on September 12 (doc. 9), and a supporting *pro se* brief on October 22, 2008 (doc. 21).   Respondent filed a response (doc. 22), asserting that Petitioner's claims were procedurally barred due to his failure to first present them to the Arkansas state courts.   *See Wooten v. Norris*, 578 F.3d 767, 777 (8th Cir. 2009) (federal habeas relief is unavailable for claims that are procedurally defaulted because habeas petitioner failed to raise them in state proceedings; a showing of "cause and prejudice" may serve to excuse a procedural default and "open the door to federal review of an applicant's otherwise defaulted claim").   Petitioner replied (doc. 25).

After reviewing the pleadings and liberally construing Petitioner's *pro se* filings, I found that his claims were procedurally defaulted but that an evidentiary hearing was necessary to develop and resolve the issue of whether he could establish "cause" to excuse his default and thus open the door to review of the merits of his substantive claims (doc. 28).   The Arkansas Federal Public Defender was appointed to represent Petitioner in all further proceedings, and a hearing was set for September 13, 2010.   Respondent then filed a motion for summary judgment (doc. 61), based on Petitioner's *pro se* filings. I granted Petitioner's motion to hold the summary judgment proceedings in abeyance so that, through counsel, he could conduct limited discovery (doc. 71).   Petitioner subsequently moved for leave to file a superseding petition, which was granted (docs. 85,

---

[26]Pet'r Ex. 36, 37; Resp't Ex. 34, 36.

104).  The superseding petition was filed by Petitioner's counsel on July 6, 2010 (doc. 86.)

Petitioner also filed a cross-motion for summary judgment (doc. 92).  In light of Petitioner's

filings and the need to give Respondent an opportunity to fully respond, the hearing was

cancelled (doc. 104).  In his response to the superseding petition, Respondent asserted

that Petitioner's claims were barred by the one-year statute of limitations applicable to

federal habeas petitions pursuant to 28 U.S.C. § 2244(d) (doc. 115).

On December 2, 2010, I recommended that both parties' summary judgment

motions be denied and that the case proceed to an evidentiary hearing on three broad

issues (doc. 132): (1) whether Petitioner could establish that his particular circumstances

were so extraordinary as to entitle him to equitable tolling of the one-year limitations period

for filing a federal habeas petition; (2) whether he could establish cause to excuse his

procedural default; and (3) whether he was entitled to relief on the merits of his substantive

claims.  Cutting across all three issues was Petitioner's allegation that he suffers from

profound mental disabilities which rendered him incapable of presenting his claims in a

timely federal habeas petition or to the state courts in compliance with the state post-

conviction rules, as well as impacting counsel's representation of him in his state court

proceedings.

On March 15, 2011, Judge Wright adopted the recommendations (doc. 148).  As

stated, I conducted a three-day evidentiary hearing July 12, 13 and 14, 2011.[27]  The parties

requested an opportunity to brief some issues, and their simultaneous briefs were filed on

August 15, 2011 (docs. 181, 182).

---

[27]The three-volume transcript of the hearing has been docketed (docs. 178-80).

17

## II.
## PETITIONER'S CLAIMS

The superseding petition, as filed by Petitioner's habeas counsel (doc. 86), raises

the following claims:

**Claim 1**:  Petitioner's right to conflict-free counsel under the Sixth and Fourteenth
Amendments was violated when his state-court attorney simultaneously represented
Petitioner, Ms. Devries, and Petitioner's son, Nathan Plunk (doc. 86, at 2-32).

A.      Counsel's clients' interests were competing in six respects:

Conflict One: Each party's interest in shifting away culpability to one or more of the
other parties.

Conflict Two: Petitioner's interest in attacking the state's case and building an
affirmative case for leniency versus Ms. Devries' and Nathan's interests in currying
favor with the state.

Conflict Three: Ms. Devries' interest in a continuing relationship with her attorney
(and counsel's interest in continuing to receive her attorney's fees) versus
Petitioner's interest in receiving full information about the case against him.

Conflict Four: Ms. Devries' interest in having her case worked up versus Petitioner's
interest in having his case worked up.

Conflict Five: Ms. Devries' interest in securing a "truthful information" sentencing
reduction versus Petitioner's interest in attacking the evidence against him.

Conflict Six: Petitioner's interest in minimizing his sentence versus Ms. Devries'
interest in minimizing her sentence.

B.      The foregoing conflicts adversely affected counsel's performance in that he:

1.      Failed to gather or utilize social history and psychological evidence;

2.      Failed to investigate the facts of the crimes or to pursue
cooperating-witness status for Petitioner;

3.      Used Petitioner's funds to benefit Ms. Devries;

4.      Failed to adequately warn of the dangers of joint representation;

18

5.    Failed to communicate plea offers and failed to adequately advise regarding plea offers;

6.    Sought leniency for Ms. Devries at the expense of a strict sentence for Petitioner;

7.    Sought adverse testimony against Petitioner;

8.    Failed to move to suppress or otherwise challenge dubious evidence;

9.    Failed to move to have Petitioner declared incompetent when it became apparent that he was unable to attend to or comprehend the terms of plea offers;

10.   Failed to move to have Petitioner declared incompetent when it became apparent, on the first day of trial, that he was unable to attend to or comprehend the in-court proceedings; and

11.   Failed to prepare to challenge forensic evidence.

**Claim 2**:  Petitioner's right to the effective assistance of counsel under the Sixth and Fourteenth Amendments was violated (doc. 86, at 32-53).

A.    Counsel's performance was deficient in that he:

1.    Unreasonably failed to warn Petitioner about the hazards of joint representation and suppressed important information from him;

2.    Unreasonably used Petitioner's limited funds to benefit Ms. Devries;

3.    Unreasonably failed to notify the court that his clients were unable to pay for competent private representation, failed to seek a court-appointment or appointment of another attorney, and failed to have Petitioner declared indigent so that court funds could be used;

4.    Unreasonably failed to move for funds to hire or for an appointment of a private investigator;

5.    Unreasonably failed to move for funds to hire or for an appointment of a mental health expert;

6.    Unreasonably failed to gather or utilize social history and psychological evidence;

7.    Unreasonably failed to investigate the facts of the crime or to pursue

19

cooperating-witness status for Petitioner;

8.     Unreasonably sought leniency for Ms. Devries at the expense of a strict sentence for Petitioner;

9.     Failed to communicate one or more plea offers to Petitioner, failed to communicate with Petitioner in a way that was reasonable considering Petitioner's neuropsychological deficits, failed to advise him about parole eligibility under the plea offer he accepted, and left him with the impression that he would be out of prison in five years if he accepted the offer and that rejecting the offer risked a sentence of life without parole;

10.    Unreasonably failed to move to have Petitioner declared incompetent to stand trial;

11.    Unreasonably failed to file a motion to suppress or motion in limine with respect to the methamphetamine seized in connection with Petitioner's first arrest;

12.    Unreasonably failed to object to admission of the drug analyst's report at trial;

13.    Unreasonably failed to contest the forensic evidence presented against Petitioner at trial;

14.    Unreasonably advised Petitioner to plead guilty and to stipulate to a seventy-two-year sentence without meaningful investigation or preparation;

15.    Unreasonably allowed Petitioner to believe he would face a life-without-parole sentence and never see his mother again if he did not plead guilty and stipulate to a seventy-two-year sentence, and that he would be out of prison in five years; and

16.    Rendered representation which was, in its totality, "unreasonably deficient."

B.     Petitioner was prejudiced in that, had counsel rendered reasonably effective performance, there is a reasonable probability that the outcome of his proceedings would have been different because:

1.     Powerfully exculpatory and mitigating evidence would have been presented;

2.     Direct evidence lessening his culpability would have been presented;

3.      The narrative painting him as an arch-villain would not have been presented;

4.      He would have received substantially less prison time as a cooperating witness;

5.      The trial court would have been required to exclude the state's forensic evidence, and he thus would not have been convicted or would have received a significantly better plea offer from the state;

6.      He would have been found incompetent to stand trial;

7.      His attempt to plead guilty and stipulate to a sentence would have been rejected as neither knowing nor voluntary;

8.      One or more of his convictions stemming from his second arrest (*Plunk 2*) would have been dismissed, incorporated into a more favorable plea offer, or tried to an acquittal;

9.      The convictions stemming from his first arrest (*Plunk 1*) would have been incorporated into a more favorable plea deal;

10.     He would have refused to plead guilty to the *Plunk 1* charges and would have insisted on a trial;

11.     He would not have accepted the seventy-two-year stipulated sentence offered by the state in *Plunk 2* and would have insisted on sentencing by the judge or jury;

12.     The judge or jury would have found mitigating factors and returned a lesser sentence; and

13.     One or more of his convictions or sentences would have been overturned on appeal.

## III.
## STATUTE OF LIMITATIONS; PROCEDURAL DEFAULT

A state prisoner seeking to challenge his state court conviction in federal court

generally must file a petition for federal habeas relief within one year after the state

conviction becomes final by conclusion of direct review or the expiration of the time for seeking such review.  28 U.S.C. § 2244(d)(1)(A).  Petitioner's plea agreements and guilty pleas waived his right to direct review, making his judgments of conviction final at the time of entry, *i.e.*, July 27, 2007.  Although his initial *pro se* federal habeas petition was timely,[28] his claims as currently framed were set forth in his superseding petition filed by counsel on July 6, 2010, almost three years later.

A federal habeas claim is procedurally defaulted if the petitioner failed to first raise it in state court proceedings.  *Wooten*, 578 F.3d at 777.  Federal habeas review of such claims is barred without a showing of cause and prejudice, or a fundamental miscarriage of justice due to actual innocence.  *Id.*  No one disputes that Petitioner failed to file a Rule 37 post-conviction petition in state court, his time for doing so has expired, and no non-futile state remedy remains available.  *See* Ark. R. Crim. P. 37.2(c) (time limitations for filing state post-conviction petition for relief).

Neither the statute of limitations nor procedural default constitutes a jurisdictional bar to federal habeas review; therefore, the Court may, in the interest of judicial economy, bypass those issues and proceed to the merits of a habeas petitioner's claims.  *See Day v. McDonough*, 547 U.S. 198, 205 (2006); *Dodge v. Robinson*, 625 F.3d 1014, 1017 n.1 (8th Cir. 2010) (declining to address procedural default issue where habeas claims can be disposed of on the merits); *Trussell v. Bowersox*, 447 F.3d 588, 590 (8th Cir. 2006) (bypassing procedural default and statute of limitations and proceeding to merits).

---

[28]Filing deadlines fall on the anniversary date of the triggering event, and a deadline is advanced to the next business day if it falls on a weekend.  *Wright v. Norris*, 299 F.3d 926, 927 n.2 (8th Cir. 2002).  July 27, 2008, was a Sunday, so the last day for Petitioner to file a timely federal habeas petition under the provisions of § 2244(d)(1)(A) was July 28, 2008.

22

As discussed below, I find that neither of Petitioner's substantive claims entitles him to federal habeas relief, obviating resolution of the difficult factual and legal issues presented and fully briefed by the parties regarding the statute of limitations and procedural default questions.  Nevertheless, I will briefly highlight some of those issues.

The Eighth Circuit has recognized that a habeas petitioner's "mental impairment can be an extraordinary circumstance interrupting the [one-year statutory] limitation period," if the impairment is of sufficient "degree and duration." *Nichols v. Dormire*, 11 F. App'x 633, 634 (8th Cir. 2001); *see also Bills v. Clark*, 628 F.3d 1092, 1093 (9th Cir. 2010) (holding that "equitable tolling is permissible when a petitioner can show a mental impairment so severe that the petitioner was unable personally either to understand the need to timely file or prepare a habeas petition, and that impairment made it impossible under the totality of the circumstances to meet the filing deadline despite petitioner's diligence"); *Riva v. Ficco*, 615 F.3d 35, 39-40 (1st Cir. 2010); *Bolarinwa v. Williams*, 593 F.3d 226, 231-32 (2d Cir. 2010).

Additionally, under Eighth Circuit law, mental illness may constitute cause to excuse a procedural bar arising from the failure to pursue state post-conviction remedies.  *Ervin v. Delo*, 194 F.3d 908, 915 (8th Cir. 1999).  Cause requires a showing of some impediment, external to the petitioner's defense and not fairly attributable to him, preventing him from constructing or raising his claims in state court or complying with the state's procedural rules.  *Coleman v. Thompson*, 501 U.S. 722, 753 (1991).  A petitioner may satisfy this standard by making a "conclusive showing" of incompetency during the period for pursuing post-conviction relief, *i.e.*, that the petitioner suffered from a mental disease, disorder or defect that substantially affected his capacity to appreciate his position and to make rational

23

decisions regarding his case and whether to continue or abandon further litigation. *Ervin*, 194 F.3d at 915-16; *Holt v. Bowersox*, 191 F.3d 970, 974 (8th Cir. 1999); *Malone v. Vasquez*, 138 F.3d 711, 719 (8th Cir. 1998); *Garrett v. Groose*, 99 F.3d 283, 285 (8th Cir. 1996); *Nachtigall v. Class*, 48 F.3d 1076, 1081 (8th Cir. 1995); *Anderson v. White*, 32 F.3d 320, 321 (8th Cir. 1994).

While it is clear – and the parties agree – that mental illness can provide a basis for overcoming either untimeliness or a default, they disagree on the precise legal standards. *Cf.* Resp't Post-Hrg. Brief (doc. 181, at 1-5) *with* Pet'r Post-Hrg. Brief (doc. 182, at 2-4). It is also unclear from the case law how much evidence is required to make a "conclusive showing" of mental illness.  The standard *may be* met where a petitioner has been diagnosed with a mental disorder, is delusional and not oriented to time, place or date, *see Holt*, 191 F.3d at 975, but requires more than the mere diagnosis of a mental disorder, *see Nachtigall*, 48 F.3d at 1081.[29]

Moreover, whatever standard is applicable, the evidence presented in this habeas proceeding was conflicting regarding the extent of Petitioner's mental problems.   In developing these issues, Petitioner was examined by two psychological experts: (1) Dr. Watson, retained by Petitioner's counsel; and (2) Dr. Moore, retained by Respondent's counsel.[30]  Although both were well-qualified, Dr. Watson is directly involved in the actual practice of neuropsychology, and Dr. Moore is not.  They agreed that Petitioner suffered

---

[29]Aside from the allegation of mental impairment, Petitioner presents other arguments to excuse his defaults and untimeliness, including the unavailability of the factual and legal bases of his claims.  *See Coleman*, 501 U.S. at 753.  Another legal issue related to the statute of limitations defense is whether which, if any, claims in the counsel-filed superseding petition relate back to Petitioner's earlier *pro se* filings.  *See Mayle v. Felix*, 545 U.S. 644, 664 (2005).

[30]Dr. Watson's report is Pet'r Ex. 4; Dr. Moore's report is Resp't Ex. 1, att. B.

from a mental defect, but disagreed on the severity of that defect and the extent to which it affected his ability to function during the period for seeking state post-conviction relief or filing a federal habeas petition.   They also used differing standards in making their assessments.  Dr. Watson was of the opinion that Petitioner's mental defect interfered with his ability to appreciate his position and make rational decisions about his case during the relevant periods, and further that it interfered with his ability to comply with procedural requirements for raising his claims.  Dr. Moore found that Petitioner's defect did not render him unable to appreciate his position or to make a rational decision in regards to whether to pursue relief.   His report did not discuss whether Petitioner had the ability to meet procedural requirements.

The basic difference between the experts' approaches was that Dr. Watson relied heavily on the results of the extensive psychological testing he conducted, while Dr. Moore felt that those results must be validated by assessing Petitioner's actual functioning capacity through interviews, interviews of third parties, and records from the Boone County jail and the ADC, including the numerous recorded phone calls he made while incarcerated.[31]   Dr. Watson felt that his test results were valid and explained why he discounted the mixed results on tests designed to measure effort and malingering.   Dr. Moore was more suspicious of the level of effort Petitioner exhibited on the various tests and felt that in his interviews and testing Petitioner was aware of what needed to be said or done to enhance his chances of success in these habeas proceedings.   Dr. Watson listened to only a few of the recorded phone calls, while Dr. Moore listened to a great many,

_____

[31]I have listened to audio recordings of these telephone calls, submitted as Resp't Ex. 48 and as Att. UU & VV to Resp't Ex. 1.

finding them to show that Petitioner functioned at a much higher level than the test results might indicate and at a higher level than found by Dr. Watson. Both experts testified at some length and, suffice it to say, their opinions differed in many respects, with each explaining where he felt the other had gone astray.

Although I have carefully reviewed the experts' testimony in this regard, along with other relevant evidence in the record, I am not conducting an exhaustive analysis at this time on the cause and equitable tolling questions due to my recommendation that Petitioner is not entitled to federal habeas relief on the merits of his claims. Should those recommendations be rejected, such an analysis would be necessary, as well as findings on the legal issues regarding the statute of limitations and procedural default defenses. Nevertheless, as addressed further below, the psychological evidence does have a bearing on various issues related to the merits of Petitioner's claims.

## IV.
## CLAIM 1: CONFLICT OF INTEREST

### A.  Law.

Criminal defendants have a Sixth Amendment right to "reasonably effective" legal assistance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Generally, a federal habeas petitioner claiming a Sixth Amendment violation in his state criminal proceedings must make two showings: (1) that counsel's representation "fell below an objective standard of reasonableness," *id.* at 688, and (2) that counsel's deficient performance prejudiced the petitioner's defense, *id.* at 687. The petitioner is prejudiced by inferior performance if "there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." *Id.* at 694.

The Sixth Amendment right to counsel also guarantees the right "to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). Nevertheless, representation of multiple defendants by a single attorney is not *per se* violative of the Sixth Amendment. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980); *see Dokes v. Lockhart*, 992 F.2d 833, 836 (8th Cir. 1993). Instead, to establish a constitutional violation due to multiple representation, a federal habeas petitioner who did not object to such representation in state court must demonstrate that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 348, 350 (same attorney represented three defendants in separate trials); *see also United States v. Acty*, 77 F.3d 1054, 1057 (8th Cir. 1996) (dual representation of defendant and her husband); *Dokes*, 992 F.2d at 836 (joint representation of co-defendants); *Dawan v. Lockhart*, 31 F.3d 718, 720-21 (8th Cir. 1994) (representation of co-defendants).

An "actual conflict" is more than "a mere theoretical division of loyalties," *Mickens v. Taylor*, 535 U.S. 162, 171 (2002), or the "possibility of conflict," *Cuyler*, 446 U.S. at 350 (defendant must show that counsel "actively represented conflicting interests"), and the "adverse effect" must be more than "merely an abstract or theoretical one," *Covey v. United States*, 377 F.3d 903, 908 (8th Cir. 2004). The effect must be "actual and demonstrable, causing the attorney to choose to engage or not to engage in particular conduct." *Noe v. United States*, 601 F.3d 784, 790 (8th Cir. 2010). To make such a showing, a petitioner must "identify a plausible alternative defense strategy or tactic that defense counsel might have pursued, show that the alternative strategy was objectively reasonable under the facts of the case, and establish that the defense counsel's failure to pursue that strategy or tactic

27

was linked to the actual conflict." *Id.* (quoting *Winfield v. Roper*, 460 F.3d 1026, 1039 (8th Cir. 2006)).   An actual conflict can occur "when counsel cannot use his best efforts to exonerate one defendant for fear of implicating the other." *Dokes*, 992 F.2d at 836.   A petitioner must show only "that the conflict caused the attorney's choice, not that the choice was prejudicial in any other way."   *Covey*, 377 F.3d at 908 ("'Adverse effect' is not the equivalent of prejudice."); *Dawan*, 31 F.3d at 721 (habeas petitioner alleging conflict of interest does not have to establish prejudice sufficient to meet *Strickland* standard).

Where a defendant fails to demonstrate that his lawyer's performance was adversely affected by any representation of allegedly conflicting interests, his conflict-of-interest claim fails.  *Noe*, 601 F.3d at 790 (conflict-of-interest claim failed because defendant could not demonstrate adverse effect from alleged actual conflict); *Winfield*, 460 F.3d at 1039-40 (habeas claim failed where petitioner failed to demonstrate "that he suffered an adverse impact from any conflict of interest" as required by *Cuyler*); *Johnson v. Norris*, 207 F.3d 515, 519 (8th Cir. 2000) (assuming an actual, as opposed to potential, conflict existed, habeas petitioner could not show that the conflict "actually affected the adequacy of [his state-court attorney's] representation"); *Acty*, 77 F.3d at 1058 (assuming that actual conflict existed due to attorneys' dual representation of defendant and her husband, defendant failed to show that conflict had adverse effect on attorneys' performance).

If a habeas petitioner is unable to demonstrate an adverse effect under *Cuyler*, he is "necessarily unable to prove prejudice under the more rigorous *Strickland* standard typically governing ineffective assistance claims." *Winfield* , 460 F.3d at 1040.  The basic difference is that in a *Cuyler* analysis, a petitioner need only show that a plausible, objectively reasonable defense or strategy was not pursued because of the conflict.  The

petitioner does not need to go on to show a reasonable probability that the outcome of the case would have been different.  To state it another way, although a petitioner alleging conflict need not show that a different outcome was reasonably probable, he is not relieved of the burden of showing a failure to pursue a plausible, reasonably objective defense or strategy due to the conflict.  There must still be a showing of adverse effect.

> **B.**     **Analysis.**

> 1.     Introduction.

It is undisputed that the same attorney represented both Petitioner and his girlfriend, Ms. Devries, in their state criminal proceedings.  While they were charged in separate cases, the initial charges for both arose out of the April 2006 incident.  It is also undisputed that the same counsel represented Petitioner's son, Nathan, although on unrelated charges.  Thus, there was a potential for an actual conflict of interest.

However, in the final analysis as discussed below, and after reviewing all the proof, I do not find that the apparent conflicts were actual conflicts which adversely affected counsel's representation, causing him to fail to pursue a plausible defense for Petitioner because of the potential for harming Ms. Devries or Nathan Plunk.

Petitioner raises several alleged conflicts which he argues prevented counsel from effectively representing him.  As an initial matter, many of the allegations and arguments in Petitioner's various pleadings are intertwined and overlapping.  While I have not tracked my discussion according to the claims as set forth in Petitioner's superseding petition, I have considered each specifically alleged conflict and adverse effect.  Several allegations regarding counsel's actions or inactions cannot be plausibly linked to the joint representation of Petitioner, Ms. Devries and Nathan Plunk.  *See Winfield*, 460 F.3d at

1039 (petitioner failed to show that attorney's allegedly poor trial strategy "was linked in any way" to the alleged conflict).  These allegations[32] are more appropriately characterized as claims of ineffective assistance of counsel and, in fact, are reasserted as such claims by Petitioner in his superseding petition.  As such, they are analyzed in the next section under the more rigorous prejudice standard applicable to ineffective-assistance claims under *Strickland*.

>  2.  Use of Petitioner's Funds to Benefit Ms. Devries.

One general allegation made by Petitioner is that his state-court counsel was not paid enough to cover his time in representing both Petitioner and Ms. Devries and that he sacrificed the level of preparation and representation of Petitioner in order to be able to better represent Ms. Devries.  Actually, the evidence is to the contrary.  Counsel spent the bulk of his time defending Petitioner on the attempted capital murder and related charges arising out of the August 2006 incident (*Plunk 2*), including taking that case to a three-day jury trial.  The full extent of his efforts is detailed elsewhere in this recommendation.  Ms. Devries' charges arose out of the April 2006 events.  She was charged with possession of methamphetamine with intent to distribute, simultaneous possession of drugs and firearms, hindering apprehension or prosecution, possession of drug paraphernalia, and possession of a narcotic drug.  By way of comparison, counsel's file for Petitioner consists of 850 pages, while his file for Ms. Devries contains less than 140 pages related to his work on her April 2006 criminal charges.[33]

---

[32]Claims 1(B)(1), (2), (8), (9), (10) and (11), and part of Claim 1(B)(5).

[33]Joint Ex. 21 is counsel's file for Petitioner, and Joint Ex. 22 is his file for Ms. Devries. Review of the latter indicates counsel also represented her on minor charges such as driving on a suspended license and on an October 2006 arrest for arriving at the jail where Petitioner was

According to counsel's file and other evidence, a public defender originally represented Ms. Devries, standing with her at her initial appearance and filing a motion for discovery.  Petitioner's trial counsel was hired in early July 2006 to represent Ms. Devries on her charges stemming from the April 2006 search.  He entered his appearance on her behalf July 12, 2006.  He filed one routine motion for discovery that same day.   Over the next twelve months, he filed a standard motion for continuance, wrote four routine letters informing her of upcoming court dates, and made a few short, routine court appearances on her those charges.[34]   After Petitioner's trial and convictions, counsel wrote some additional letters to Ms. Devries about court dates, filed another motion for continuance, and made some brief court appearances.  Some of this work was in connection with the charge of furnishing prohibited articles to Petitioner at the Boone County jail in July 2007.  Counsel's final appearance was to enter Ms. Devries' pleas on all the charges in January 2008, for which she received probation and 120 days in community correction.[35]

The record does show that counsel did at least some limited negotiation on Ms. Devries' behalf after Petitioner's trial and commitment to the ADC.  The deputy prosecutor who handled Ms. Devries' cases was Chris Carter.  He testified at the habeas hearing, consistently with his representations in state court proceedings, that after Petitioner's conviction and his transfer to the ADC, defense counsel argued that Ms. Devries was just

---

confined, with prescription drugs in her purse.  She also needed legal work related to financial trouble and problems with a guardianship of her son.  It does not appear that any of these cases required significant time or expense, and there is no evidence in the record as to how counsel was compensated for those unrelated charges.

[34]Joint Ex. 22, at 117, 119-23, 143, 146-48; Joint Ex. 6 (court transcripts).

[35]Pet'r Ex. 36.  He later did some additional work to ensure that she was given the correct amount of jail credit for time served.  (Joint Ex. 22, at 1-6, 100-07, 126-29. 136-37.)

a follower and blindly in love and had emphasized "greatly" that she was led astray by Petitioner.[36] However, the record contains no other evidence that counsel spent significant time in negotiating on her behalf or that he ever had to prepare for trial on her behalf. The record as a whole shows that Ms. Devries' case was essentially not the first priority, and that trial counsel's time was primarily spent on Petitioner's defense, at least until after his trial.

   3.   Attempts to Shift Culpability.

Petitioner complains that counsel denigrated him and maximized his culpability to prosecutors, while minimizing Ms. Devries' culpability. There was no proof that this took place. The sole evidence is the statement mentioned above that she was led astray. Had counsel argued that point while Petitioner's cases were still active, there would be an actual conflict. However, the deputy prosecutor (Mr. Carter) testified that this did not occur until well after Petitioner had been tried, convicted and sent to the penitentiary. His testimony on this and other points is credible. There is no other evidence in the record that counsel tried to minimize Ms. Devries' role or maximize Petitioner's. Petitioner has simply failed to prove the allegation that counsel sought leniency for Ms. Devries at his expense by advancing a factual narrative and theory of the case that was prejudicial to him or that counsel "villainized" him.

A closely related assertion is that counsel failed to pursue the strategy of showing that Ms. Devries and Nathan Plunk were the truly culpable ones in the drug operations and that Petitioner was only a minor participant. While such a strategy might help a defendant

---

[36]Pet'r Ex. 36, at 6.

in a particular case, Petitioner has not shown that this would have been an objectively reasonable or even plausible defense strategy in this case. He has presented no evidence that Ms. Devries or Nathan were, indeed, the driving force behind his violations. Ms. Devries, in a declaration,[37] stated that she knew Marty Matzenauer and Janice McTyer (who all agree were involved in the methamphetamine trade), that she was closer than Petitioner to Ms. McTyer, and that Ms. McTyer knew her better than Petitioner did. This falls far short of an admission that she was involved, or more involved than Petitioner, in the drug trade. Petitioner was the one caught – twice – with methamphetamine on his person and in his vehicle. He was the one who tried to sell to an undercover agent and who tried to flee on both occasions. He is the one who was named by other confidential informants as receiving and selling large amounts of methamphetamine both before and after the April 2006 arrest.[38] There simply is no evidence in the record that either Ms. Devries or Nathan were major players, or that they were more culpable, and Petitioner has not shown that such evidence could have been developed.

Further, as far as guilt is concerned, it would be immaterial whether Petitioner was a major participant or merely a minor participant. His charges did not go beyond the acts in which he personally engaged. That is, he was not charged with drug conspiracy or trafficking. While the extent of his role might have had some bearing on punishment, the fact remains that there was no proof that he was a minor player or that Ms. Devries or Nathan Plunk were major participants. Thus, Petitioner has failed to demonstrate that

[37]Pet'r Ex. 11 ¶ 6.

[38]*See, e.g.,* Resp't Ex. 13; Joint Ex. 21, at 311-13, 355-58, 442. The contents of these investigative reports are discussed below. They significantly implicate Petitioner as a principal participant.

33

advancing such a theory would have been objectively reasonable or even plausible.

It can also be noted at this point that there was absolutely no evidence that counsel's representation of Nathan Plunk on other charges created any situation where counsel would have failed to advance any defense or strategy for fear of compromising Nathan's defense.

4.    <u>Use of Ms. Devries' Statement to Police</u>.

In his pleadings, Petitioner alleged that Ms. Devries talked with police about his involvement in the drug trade, including details, and that this created a conflict which operated to his detriment.  However, with all the proof in, it is clear that the sole statement she made to police was after Petitioner was arrested in August during the controlled buy. The content of her statement is included in an investigator's report dated August 28, 2006, the date of the controlled buy.[39]  Police went to Petitioner's mother's house after the arrest, where they conducted a search and interviewed Ms. Devries.  Briefly, as previously stated, she did give them information that the methamphetamine dealing had begun about a year and a half previously, that the amounts had increased, that Petitioner had said he was going to get methamphetamine from an individual the previous weekend, and that he had been gone for approximately nine hours, returning with about one pound.  She gave other details of her and Petitioner's involvement in the drug trade.  Although the investigative report states that she agreed to meet with the prosecutor and restate her "confession," this never happened.

Petitioner's Exhibits 33 and 33A are redacted versions of page three of the

---

[39]Joint Ex. 19, at 3.

investigative report detailing the statement, which Petitioner contends is the only version he got.  One of the names redacted is that of Deborah Devries.  Petitioner contends that trial counsel redacted the names to prevent Petitioner from learning that Ms. Devries had "turned" on him, thus hiding a conflict.  Habeas counsel went to some lengths to try to show that these documents were not a part of trial counsel's file produced in discovery in this proceeding, which they argue is suspicious and an indication of an attempt to hide a conflict.[40]

Petitioner testified that he received the redacted version before his trial, and did not remember getting an unredacted version.  He said he did not know Ms. Devries had made the statement until the ADC inmate who assisted in his habeas proceedings, Robert Hall, held the document to the light and was able to read the redacted information.[41]  I find this contention is not credible.  Anyone familiar with the parties and the situation, especially Petitioner, could have readily discerned from the content and context of the statement that the person giving the information could be none other than Ms. Devries.  Trial counsel testified that he did not redact the document and that he turned over his entire file during discovery in this proceeding.  He correctly pointed out that the names of Mr. Matzenauer and Ms. Holt were also redacted,[42] and there is no reason why those would be taken out if the motive was to hide a conflict between Ms. Devries and Petitioner.  The proof does not

---

[40]See Hearing Tr. Vol. 2, at 313-25.

[41]The document admitted as the "original" which had been in Petitioner's possession is Pet'r Ex. 33A.

[42]Redaction of these two names makes it more likely that someone in the prosecutor's office made the deletions. The testimony of one of the deputy prosecutors, Mr. Bradford, was that it was not uncommon for their office to redact the names of informants or other individuals when producing documents in discovery.

establish one way or the other who may have redacted the document or whether it was withheld from discovery.

Those questions need not be answered because the statement does not create an actual conflict, let alone one which adversely affected Petitioner's defense.  There are several reasons for this conclusion.  First, Ms. Devries did not tell police anything they did not already know.   In an investigative report dated May 3, 2006, there is a detailed discussion of what investigators had learned about the methamphetamine distribution and sale activities of Petitioner, Mr. Matzenauer and Ms. Holt/McTyer.[43]  Police obviously had received a good deal of information about Petitioner's direct and extensive involvement from confidential sources.  Among other things, police had learned that Petitioner had received four pounds of methamphetamine delivered by Ms. Holt/McTyer and that he kept methamphetamine in a recreational vehicle on his mother's property.  There was much other detail, and it was on the basis of the information received that the attempted traffic stop of Petitioner and resulting chase of April 24, 2006, were initiated.  Likewise, an investigator's report dated August 28, 2006, the day of the controlled buy, shows that investigators had developed information through an informant that Petitioner was still selling large amounts of methamphetamine even after his initial arrest, and that he had just taken delivery of three-quarters to one pound.  Further, calls from an informant clearly showed that Petitioner was directly involved in a proposed sale of a substantial amount of methamphetamine for $11,500; and, of course, he personally attempted the sale, which led

---

[43]Resp't Ex. 13, at 1, 5-6.

to his arrest in *Plunk 2*.[44]  All of this information was developed prior to and independently of anything Ms. Devries said on August 28, 2006.

Second, the information Ms. Devries gave in talking to officers was neither needed nor used in Petitioner's prosecution.  She did not make the statement until after Petitioner had already attempted the sale and been arrested.  He was not charged with actual distribution or conspiracy, but with possession with intent and an attempted sale, which could be proved as to both cases by merely showing what he had in his personal possession and what his actions were.  Police had the proof they needed when he attempted the sale to the undercover agent, with three-quarters of a pound of methamphetamine in his car and more hidden in his socks.

Third, the statement was not on the advice of, in the presence of, or with knowledge of counsel. Ms. Devries did not become an informant and she did not furnish further information to the police or prosecutors.  Affidavits from two investigators definitively stated that she did not supply them with information that led to either of Petitioner's arrests, and they did not seek her cooperation or use her as an informant regarding his drug activities.[45]

Thus, while the statement Ms. Devries gave the officers at first blush may seem to create a conflict, under the circumstances here, there was no actual conflict.  It did not present counsel with a situation where he would have to take, or fail to take, any action which would hurt Petitioner in order to help Ms. Devries.

5.      Request for Ms. Devries' Testimony Against Petitioner.

---

[44]Joint Ex. 21, at 311-13, 355-58 (summarizing information known by officers on Aug. 28, 2006).

[45]Resp't Ex. 21 ¶¶ 5 & 6 (Affidavit of Investigator Tom Smith); Resp't Ex. 22 ¶¶ 7-10 (Affidavit of 14th Judicial Task Force Coordinator Greg Harris).

There is also an allegation that a deputy prosecutor (Mr. Carter) asked Ms. Devries to testify against Petitioner while the cases were pending.  Ms. Devries, in a declaration[46] and in her testimony at the habeas hearing, stated she had been asked to testify against Petitioner.  She said that at one of her court appearances, trial counsel and Mr. Carter conferred and then counsel told her Mr. Carter wanted her to testify against Petitioner, saying she had to make up her mind immediately whether to do that or go to trial on her charges.  In her declaration, she said she told counsel, "I would rather shoot myself in the head than testify against Terry."  Trial counsel denied that any such request occurred.  Mr. Carter testified that he would never ask a co-defendant to testify against another where both were represented by the same counsel because that would cause a conflict.  He said that if he asked anyone about Ms. Devries' being a witness, it would have been the public defender who represented her before retained counsel entered his appearance.  Mr. Carter's testimony is more credible, based on the demeanor of the witnesses, their motivation in testifying, and the fact that Ms. Devries' testimony was not really needed.  As discussed above, prosecutors had all they needed to convict Petitioner without whatever testimony Ms. Devries could have provided.  I find that the preponderance of the evidence is that the request did not occur.  Even if we were to assume that Ms. Devries told the truth and that counsel did not withdraw, the conflict was immediately resolved when she stated she would rather shoot herself in the head than testify against Petitioner.  There is no ground for relief under this accusation.

      6.     <u>Conflicting Defenses on Firearms Charges</u>.

---

[46]Pet'r Ex. 11.

Another potential conflict arose out of possession of the .45 caliber pistol and other firearms seized as the result of the search of Petitioner's recreational vehicle in April 2006. This vehicle was located on Petitioner's mother's property and the record shows he and Ms. Devries either lived there or had joint access to it.   It belonged to Petitioner.[47] Petitioner's theory presumably would be that counsel should have advanced the argument that the guns belonged to Ms. Devries, rather than Petitioner, as a defense to the charge of being a felon in possession of a firearm or simultaneous possession of drugs and a firearm, and that counsel failed to do so for fear of implicating Ms. Devries.  The question is whether this would have, indeed, been a plausible or objectively reasonable defense for Petitioner.   Ms. Devries testified that there were guns in their home, that they were registered to her and not to Petitioner, and that she owned them.  She was more candid in her declaration, where she stated, "Terry and I did have guns in our house, they were in my name because I had never been a felon."[48] (Emphasis added.)  I find this defense would not have been plausible or objectively reasonable to pursue for two basic reasons. First, it is clear from what Ms. Devries has said, the guns were registered in her name merely because she was not a felon at the time.  Second, and more importantly, it is clear she and Petitioner had joint access to the weapons.  They were in the home owned by Petitioner, where he and Ms. Devries resided.  There was no proof that his access was in any way restricted.  Thus, he was in possession and subject to the charges, despite the

---

[47]In a recorded phone call from the Boone County Jail, Petitioner talked about how to take care of the vehicle and mentioned what he had paid for it. (Resp't Ex. 48.)  *See also* Joint Ex. 21, at 222-23 (search warrant describing recreational vehicle as "belonging to Terry Plunk") & 355 (stating that Petitioner's mother "confirmed" to investigator that Petitioner owned the recreational vehicle); Resp't Ex. 16 (referring to "Plunk's recreational vehicle").

[48]Pet'r Ex. 11 ¶ 1.

fact that the firearms may not have been registered in his name.  *See Killian v. State*, 959

S.W.2d 432, 434 (Ark. Ct. App. 1998) (substantial evidence supported felon-in-possession

conviction where handgun was found in house occupied by defendant and girlfriend even

though girlfriend testified that gun belonged to her).  Moreover, it is undisputed that, when

Petitioner was arrested in Missouri, he had a loaded magazine that matched one of the

pistols seized from the residence.  This constitutes an additional factor linking Petitioner to

the firearms, which Arkansas law requires when firearms are found in a residence that is

jointly occupied.  *See id.*

       7.   Negotiation of Package Plea Deal.

Another potential conflict I have considered is whether the attempts to reach a

"package deal" for Petitioner and Ms. Devries gave rise to a conflict detrimental to

Petitioner's case.  There were negotiations to resolve both of their cases at the same time.

However, all such proposals by the prosecution would have required Petitioner to plead

guilty to attempted capital murder.  Trial counsel and Petitioner consistently refused those

offers and chose to go to trial on *Plunk 2* rather than plead to that offense.  At the habeas

hearing, Petitioner testified that one time, counsel tried to get him to take a deal "that would

make it better for Deb, she could probably get probation," but he said no and refused to

take any plea deal that involved pleading guilty to the attempted capital murder.

Those negotiations did not adversely affect Petitioner's defense.  The plea

agreements ultimately reached after the trial on *Plunk 2* did not include any relief or

provision favoring or even mentioning Ms. Devries' charges.[49]  Nothing in Petitioner's

---

[49]Resp't Ex. 5 & 9.

testimony – or anyone else's – suggested that counsel pushed him to accept the final plea deals by saying that it would help Ms. Devries.  There is no evidence in the record of any unspoken understanding that she would receive better treatment because of Petitioner's plea, and, in fact, the deputy prosecutor's testimony that Petitioner's counsel later argued in negotiations that Ms. Devries was love-struck and influenced by Petitioner, showed no deal had been reached and that negotiations were ongoing.  If anyone was disadvantaged by the efforts to reach a package deal, it was Ms. Devries.

I find that counsel's advice to Petitioner to accept a plea agreement to resolve both his cases and agree on a sentence was not because of his representation of Ms. Devries, but was because of a legitimate concern that the outcome could have been much worse had Petitioner failed to plead.  There were significant aggravating factors.  As discussed elsewhere, Petitioner was charged with being an habitual offender, with at least four prior felonies.  The offenses in *Plunk 2* were committed while he was on bond for the offenses charged in *Plunk 1*.  The prosecution's evidence was strong in both cases for all the drug and fleeing charges.  The prosecution was preparing to show the chase video from *Plunk 1* as part of its sentencing presentation, and there has been no suggestion that it would not have been entitled to do that for sentencing purposes.  Anyone who has viewed the video would understand counsel's concern.   The jury had just acquitted Petitioner on the attempted murder charge and, being confronted with evidence that Petitioner was not the vision-impaired individual he was portrayed as being, could well have been incited to set a very high sentence.   Life was a distinct possibility.   Whatever the outcome of those sentencing proceedings, Petitioner would have been faced with trial and probable conviction in *Plunk 1*, with sentencing again to be decided by a jury.  In addition to the four

41

prior felonies, he would have had the two felonies arising from his convictions in *Plunk 2* on his record.  Because he was charged with fleeing, the jury would see the chase video as part of the case on guilt.  As trial counsel feared, these factors could have cascaded to a very unfavorable result.  Given all the circumstances, and recognizing that trial counsel did not have the luxury of time for extended analysis that this Court has, I cannot conclude that his advice to Petitioner at that time was motivated by a conflict, *i.e.*, a concern for Ms. Devries' welfare.

       8.    <u>Disparity in Sentences</u>.

Nor does the disparity in sentences between Petitioner and Ms. Devries establish a conflict which operated to Petitioner's detriment.  The charges brought against Petitioner were actual possession, and the acts of fleeing and attempting to sell methamphetamine to an undercover agent.  Ms. Devries was connected to him and was in the home.  There is some indication in the record that she flushed drugs when the search was executed,[50] but the proof on that was equivocal.  Basically, she was a close associate of Petitioner and living with him in the home where drugs and weapons were found.  Mr. Carter was the deputy prosecutor handling her cases.  He testified that he felt there was a good case against her, but that he was overruled by Prosecutor Ron Kincaid who did not feel they had enough evidence for conviction or for a significant sentence.  It is true that prosecutors may have been less interested in Ms. Devries after they obtained Petitioner's conviction and plea, which resulted in a long sentence, but that does not establish her less severe sentence was because Petitioner's lawyer sacrifice him to protect her.

---

[50]See Pet'r Ex. 36, at 6 (prosecutor's statement at Ms. Devries' plea hearing).

9.    Failure to Warn of Hazards of Joint Representation.

Finally, Petitioner says counsel failed to warn him of the general dangers of joint representation, which counsel denied.   Counsel testified at the habeas hearing that he talked "at length" with Petitioner about his joint representation of Petitioner and Ms. Devries.  According to counsel, Petitioner "wanted to make sure she was taken care of" and did not want her to be represented by a public defender.   Even if counsel failed to adequately explain the risks involved with joint representation, if there was no actual conflict which adversely affected his defense, no harm arose from this failure.

10.    Summary.

In sum, Petitioner has failed to demonstrate that counsel actively represented conflicting interests and that such representation adversely affected his performance on Petitioner's behalf.   There was no actual conflict, and his conflict-of-interest claims as set forth in Claim 1 fail.


## V.
## CLAIM 2: INEFFECTIVE ASSISTANCE OF COUNSEL

**A.    Law.**

As stated, *Strickland* requires two showings: (1) counsel's representation "fell below an objective standard of reasonableness," and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694.  To satisfy the prejudice requirement in connection with entry of a guilty plea, a petitioner must demonstrate "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to

trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

In evaluating an ineffective-assistance claim, *Strickland* directs the reviewing court to apply a "strong presumption" that counsel's performance "falls within the wide range of reasonable professional assistance" and to further presume that the challenged action "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. Judicial scrutiny of counsel's performance must be "highly deferential," and events must be viewed from counsel's perspective at the time of trial in an effort to "eliminate the distorting effects of hindsight." *Id.*

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010). The standard must be applied "with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011). Unlike a later reviewing court, "the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." *Id.* While it is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence," the question on review must be "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Id.* (quoting *Strickland*, 466 U.S. at 689-90).

The United States Supreme Court recently noted that "[p]lea bargains are the result of complex negotiations suffused with uncertainty, and defense attorneys must make careful strategic choices in balancing opportunities and risks." *Premo v. Moore*, 131 S. Ct. 733, 741 (2011). The Court further stressed the importance of adhering to the *Strickland*

44

standard when reviewing choices an attorney made at the plea bargain stage:

> [T]he potential for the distortions and imbalance that can inhere in a hindsight perspective may become all too real.  The art of negotiation is at least as nuanced as the art of trial advocacy and it presents questions farther removed from immediate judicial supervision.  There are, moreover, special difficulties in evaluating the basis for counsel's judgment: An attorney often has insights borne of past dealings with the same prosecutor or court, and the record at the pretrial stage is never as full as it is after a trial.   In determining how searching and exacting their review must be, habeas courts must respect their limited role in determining whether there was manifest deficiency in light of information then available to counsel.

*Id.*  The Court highlighted the differences between ineffective-assistance claims in cases where there was a full trial on the merits and those where a plea was entered at an earlier stage of the proceedings:

> A trial provides the full written record and factual background that serve to limit and clarify some of the choices counsel made. Still, hindsight cannot suffice for relief when counsel's choices were reasonable and legitimate based on predictions of how the trial would proceed .... Hindsight and second guesses are also inappropriate, and often more so, where a plea has been entered without a full trial. ... The added uncertainty that results when there is no extended, formal record and no actual history to show how the charges have played out at trial works against the party alleging inadequate assistance. Counsel, too, faced that uncertainty.  There is a most substantial burden on the claimant to show ineffective assistance. The plea process brings to the criminal justice system a stability and a certainty that must not be undermined by the prospect of collateral challenges in cases not only where witnesses and evidence have disappeared, but also in cases where witnesses and evidence were not presented in the first place.

*Id.* at 745-46 (citation omitted).

**B.    Analysis.**

1.    <u>Failure to Gather or Utilize Social History and Psychological Evidence</u>.

Petitioner alleges that counsel's performance was unconstitutionally deficient under *Strickland* when he unreasonably failed to hire or move for appointment of a mental health expert (Claim 2(A)(5));  unreasonably failed to gather or utilize social history and

45

psychological evidence (Claim 2(A)(6)); unreasonably failed to communicate with Petitioner in a way that was reasonable considering Petitioner's neuropsychological deficits (part of Claim 2(A)(9)); and unreasonably failed to move to have Petitioner declared incompetent to stand trial (Claim 2(A)(10)).   Petitioner further alleges that, if counsel had rendered reasonably effective performance in this regard, there is a reasonable probability that powerfully exculpatory and mitigating evidence would have been presented (Claim 2(B)(1)); direct evidence lessening his culpability would have been presented (Claim 2(B)(2)); he would have been found incompetent to stand trial (Claim 2(B)(6)); his attempt to plead guilty and stipulate to a sentence would have been rejected as neither knowing nor voluntary (Claim 2(B)(7)); one or more of his convictions would have been dismissed, incorporated into a more favorable plea offer or tried to an acquittal (Claim 2(B)(8) & (9)); or the judge or jury would have found mitigating factors and returned a lesser sentence (Claim 2(B)(12)).

While there is a definite dispute as to its severity, Petitioner has a history of mental impairment.   Records and materials reviewed by Petitioner's expert, Dr. Dale Watson, reveal that history.[51]  According to educational records, Petitioner was retained in grade as early as the first grade, retained in the second grade, spent two years in the third grade and then was assigned to the fourth grade because of his age.  One teacher considered him as very slow and a poor reader, although she said he worked hard and did his very best. He apparently dropped out of school at the end of eighth grade.   Group IQ tests

---

[51]Pet'r. Ex. 2 is a list of materials reviewed by Dr. Watson, and most of those materials were submitted as Pet'r Ex. 5-12.  Pet'r Ex. 3 is a list of the instruments administered to test and evaluate Petitioner.  Dr. Watson's report, dated July 20, 2010, is Pet'r Ex. 4.  There is no dispute as to the accuracy of the historical documentation Dr. Watson assembled in doing his evaluation.

administered in 1965, 1966 and 1968 showed a borderline IQ, ranging from 74 to 63. These scores are reasonably close to his scores in testing done during his adult years, including that done by Dr. Watson.[52]

In February 1999, Petitioner suffered a severe traumatic brain injury when he fell three stories from a building while he was working as an iron worker.  He landed face first, chest down, incurring bilateral fractures of the wrists, a fractured femur, multiple facial fractures, an open skull fracture with compression on the left side and epidural hematoma. Thomas Blansett, Ph.D, conducted a comprehensive neuropsychological evaluation following the accident.  Petitioner complained of loss of the sense of smell and numbness on the left.  The results of Petitioner's neuropsychological evaluation revealed a Verbal IQ of 66, a Verbal Comprehension Index score of 68 and a Working Memory Index of 69.  Dr. Blansett found Petitioner to have significant problems with intellect, reasoning, executive functions and problem solving.  He found his client's social reasoning to be deficient and that he had problems with abstract reasoning.  Dr. Blansett reported, "Overall Mr. Plunk's performance in the areas of problem-solving and reasoning revealed severe deficits, which correspond to left frontal and left pre-frontal damage, which is documented on previous imaging test results."[53]

As stated above, the early IQ scores, as well as scores obtained in testing by Dr. Watson, show that Petitioner's intellectual functioning falls near the bottom of the borderline range.  In summary, Petitioner suffers from borderline intellectual functioning, overlaid with

---

[52]While Petitioner's IQ can be considered overall as borderline, it is very close to the lower end of that classification.

[53]Pet'r Ex. 9, at 7 (Dr. Blansett's report dated July 13, 1999).

the results of his traumatic brain injury in 1999.

Dr. Watson concluded that Petitioner's mental impairment is of sufficient degree that it should serve as cause to excuse his procedural default or as a basis for equitable tolling of the statute of limitations, the primary issues that he was asked to assess.  The limitations he found were primarily in the areas of verbal reasoning, verbal memory, sustaining attention and concentration, speed of information processing, auditory and language processing and executive function.[54]  On the other hand, Respondent's expert, Dr. Roger Moore, disagreed, finding that Petitioner was capable of appreciating his position and making a rational choice whether to proceed.[55]

This brief summary shows that Petitioner does suffer from mental impairments that could be relevant to the issue of his competency at the time of his alleged acts as well as his competency to stand trial.  It could also have been a factor in negotiating a plea agreement, and would be a potentially mitigating factor to be taken into account by a judge or jury in sentencing.

Trial counsel did not investigate Petitioner's mental health background.  Although he and his client apparently discussed the injuries Petitioner suffered from the 1999 fall, counsel did not follow up to obtain medical records.  He did file motions for psychiatric evaluations in both Petitioner's cases.  Counsel testified that Petitioner could not remember the names of his treating physicians, that he did not have the money to hire an expert, and that he filed a motion for psychiatric evaluation partly because he hoped that maybe the

---

[54]Pet'r Ex. 4, at 39-44.

[55]Dr. Moore's report, along with the materials he considered appear in Resp't Ex. 1 (three volumes).  Att. B is his report dated May 11, 2011.

evaluator could, when he interviewed Petitioner, track down some of the places where he received treatment and obtain some history of all the health issues.

Trial counsel testified that, at first, he and his client had meaningful discussions. However, as his representation continued, especially after Petitioner was arrested the second time and remained jailed, he felt that Petitioner's mental health started to deteriorate, and that if he got worse, counsel would be concerned about his mental health and his ability to assist in the defense.  That was when he filed motions in both cases for a psychiatric evaluation.  Those motions stated, "That during the course of representing the Defendant it has become increasingly apparent to the Defendant's attorney that the Defendant may not presently be competent or have the capacity to assist in his own defense."[56]  The motions were granted, but when the examiner reported that Petitioner was mentally competent,[57] counsel accepted that and took no further action, such as asking for an independent examination or otherwise challenging the findings.  Trial counsel testified that his main concern was defending the attempted capital murder charge in *Plunk 2*, and that he was focused on that aspect of the defense.

Petitioner was involved in both worker's compensation and social security proceedings following his injury.  His federal habeas counsel was obviously able to obtain extensive medical records from those proceedings, as well as school records.

Petitioner argues that his state court counsel should have obtained evidence of his intellectual limitations and of his psychological problems to be used in conjunction with the

---

[56]Joint Ex. 18.

[57]Joint Ex. 16 (report of Adam T. Brazas, Ph.D.).

motion for the competency examination.  He says the information would have been useful to the examiner, who may have reached a different conclusion.  He also argues that the information could have been helpful in negotiations with the prosecution, leading to a more favorable plea bargain.  Additionally, he argues that the available material would constitute mitigating evidence which could have been presented to a judge or jury in sentencing proceedings.  As a related matter, he argues that counsel should have moved for funds to obtain an independent psychological examination to determine whether he was competent to stand trial.

Trial counsel very effectively represented Petitioner on the attempted capital murder charge, obtaining an acquittal.  This charge was based on the allegation that as one of the officers moved behind Petitioner's vehicle during the arrest, Petitioner tried to back out and run over him, and was prevented from doing so only by the officer's shooting him in the shoulder.  The state presented evidence that Petitioner had told a confidential informant that if the buyer turned out to be police, he would kill him and do whatever it took to get away.  The state court trial transcript shows counsel was well prepared to cross examine the witnesses who were involved in the controlled buy.  He was familiar with the facts of the operation and the layout of the area where it took place.  He testified that he had reviewed every item of actual physical evidence, diagrams, the master drawing of the tourist information center where the buy took place, and police reports.  He met with Petitioner and went over all the evidence with him, to get a time line and to get his perceptions.  He established Petitioner's vision problem and presented the argument that Petitioner's partial blindness indicated he would have been unable to see the officer.  He proved there was no revving of the engine or "squalling" of tires and that the vehicle backed only a short

distance.  He did an effective job of discrediting the testimony of the confidential informant.

Also, on the charges of possession of methamphetamine, counsel made a strong effort to

exclude the lab test results.  He was partially successful, in that he got two statements from

lab personnel excluded.  He further persuaded the trial court to grant a directed verdict on

the charge of attempted delivery of methamphetamine.

Be that as it may, it is certainly arguable that the failure to conduct an investigation

into Petitioner's psychological impairments falls below an "objective standard of

reasonableness."  Counsel knew that Petitioner had mental impairments.  He also knew,

according to his own testimony, that the drug charges in the two cases would, under the

facts, be very difficult to defend.  This seemingly would make the development of evidence

of mental impairments even more important, either as a way of avoiding prosecution or at

least as a mitigating factor, to be used in negotiations or sentencing.  Counsel did move for

a psychiatric evaluation, but, despite his expressed attitude of skepticism regarding findings

of competency, he did not take further steps to challenge the findings or to obtain an

independent examination.  I find that this failure fell below the *Strickland* standard.

However, a finding that the representation fell below standard is only the first step.

To prevail, Petitioner must also show that counsel's performance prejudiced him.  Prejudice

is shown if "there is a <u>reasonable</u> <u>probability</u> that, but for counsel's unprofessional errors,

the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694

(emphasis added)

The psychologist who evaluated Petitioner's competency following counsel's

successful motion for psychiatric evaluation was Adam T. Brazas, Ph.D.  He rendered

opinions on both fitness to proceed and criminal responsibility.[58]  Dr. Brazas found that at

the time of the examination, Petitioner had a factual and rational understanding of the

proceedings against him, and he had the capacity to effectively assist his attorney.  He

further found that at the time of the alleged offenses:

- Petitioner functioned in the average range of intelligence and his diagnosis of an adjustment disorder did not meet the criteria for a mental disease or defect.

- Petitioner had the capacity to appreciate the criminality of his conduct.

- Petitioner had the capacity to conform his conduct to the requirements of the law.

Dr. Brazas followed each opinion with a statement of reasons for his conclusions.  His

finding that Petitioner was of average intelligence and without a mental defect was

erroneous and contrary to the evidence in this habeas proceeding.  To measure

intelligence, he used the "Kent" test, which Dr. Watson characterized as obsolete and of

doubtful accuracy.   However, the reasons Dr. Brazas listed following his various

conclusions are for the most part reasonable and based on his conversations with and

observations of Petitioner.  His assessment also included additional procedures such as

the Georgia Court Competency Test (Mississippi State Hospital Revision).

Petitioner suggests that if Dr. Brazas or another mental health expert had the benefit

of the full background on his mental health, his brain injury and results of that injury, they

would have found Petitioner lacked the *mens rea* necessary to support a conviction on the

drug-related charges.  Because he clearly intended to flee (at least in *Plunk 1*) and to

---

[58]Joint Ex. 16 is Dr. Brazas' report, dated April 19, 2007.

possess the drugs and other items,[59] this seems to be essentially an argument that Petitioner's mental impairment would be found to have rendered him free of criminal responsibility, *i.e.*, that because of a mental disease or defect, he lacked the capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.[60]

I do not find it reasonably probable that an examiner or court would have found Petitioner lacking the capacity to appreciate the criminality of his acts or lacking the capacity to conform his behavior to the law, even with the additional information.  In fact, it is more likely that the result would have been the same on these questions.  Dr. Brazas listed a number of factors as the basis for his conclusions on capacity to appreciate and to conform.[61]  These include Petitioner's admissions to Dr. Brazas of knowledge of the criminality of his various alleged acts, the fact that in April 2006 he fled and led officers on a long, dangerous high-speed chase while throwing bags of what tested to be methamphetamine out the vehicle window, and the fact that he tried to flee the scene during the August 2006 controlled sale.  These acts are enough by themselves to convince me that he well understood the criminality of his actions.  Further, his care in his phone conversations from the jail to Ms. Devries not to say anything incriminating (telling her they had to be careful what was said on the phone), and his care not to incriminate himself in

---

[59] *See* Ark Code Ann. § 5-2-202 (defining culpable mental states under Arkansas law).

[60] *See id.* § 5-2-312(a)(1) ("It is an affirmative defense to a prosecution that at the time the defendant engaged in the conduct charged he or she lacked capacity as a result of mental disease or defect to ... [c]onform his or her conduct to the requirements of law; or ... [a]ppreciate the criminality of his or her conduct.")

[61] Joint Ex. 16, at 10-12.

conversations with Dr. Brazas also demonstrate that he appreciated the criminality of his actions.

Dr. Brazas' reasons for finding that Petitioner was able to conform his actions to the law are not as convincing.  They basically recite the fact that he did not run from police on prior traffic stops, that he has complied with traffic laws in the past and that there were times when he had methamphetamine and did not try to sell it.  He also pointed to Petitioner's knowledge that he was not supposed to have a gun and his statement that he had not had one since his prior felony conviction.  This overlooks the facts that Petitioner was in possession of a loaded magazine for a .45 caliber pistol in the April 2006 incident and that a .45 caliber pistol was found in his dwelling during the subsequent search. Nevertheless, Petitioner would have had and does have the burden of proving that he could not conform his behavior to comply with the law.  He has produced no such evidence.  Dr. Watson made no comment on this issue and the medical records, while indicating that the 1999 fall impaired Petitioner's reasoning, problem solving, verbal fluency and overall memory, contain no indication that either his pre-existing condition or the results of the fall would have affected his ability to conform his behavior.[62]

Nor is it reasonably probable that Petitioner would have been found incompetent to stand trial had Dr. Brazas or another examiner had the benefit of all records and information pertaining to Petitioner's mental impairments.  The test for competency to stand trial is found in Ark. Code Ann. § 5-2-302(a), which provides:

---

[62]I have not overlooked the fact that Dr. Watson reported that the result of one test raised concerns about Petitioner's competency.  He specifically stated that he did not evaluate competency.  This point is further discussed below.

> No person who lacks the capacity to understand a proceeding against him or her or to assist effectively in his or her own defense as a result of mental disease or defect shall be tried, convicted, or sentenced for the commission of an offense so long as the incapacity endures.

The record shows Petitioner understood the charges and the nature of the proceedings against him.  First, he was no stranger to the legal system, having been through prior criminal proceedings, amassing at least four previous felony convictions.  He was knowledgeable enough to refuse to give statements to officers following the two arrests involved in this habeas proceeding, despite their efforts to convince him he would be better off if he cooperated.[63]  Dr. Brazas noted in this report that on the test evaluating court competency, Petitioner understood the courtroom layout and understood the roles of the various participants, although he was not clear on all the duties of the judge.  Dr. Brazas found Petitioner had a basic understanding of his criminal charges and expressed appreciation of their seriousness.  He understood what guilty, not guilty, and not guilty by reason of insanity mean, and understood the nature of plea bargains.  He understood his right to subpoena witnesses and that he should inform his counsel if he considered a witness to be lying.  Dr. Brazas concluded this section of his report by saying that Petitioner was able to engage in conversation about the legal system, the charges against him and other related topics in a lucid, coherent and rational manner.  Tellingly, Dr. Brazas related that Petitioner declined to relate his version of the offenses, demonstrating that he understood not to make incriminating statements that might be used against him.[64]

---

[63]Joint Ex. 14, 15.  I have listened to the audiotape of the April 2006 custodial interview (Resp't Ex. 1, att. RR), and have viewed the videotape of the August 2006 interview (Resp't Ex. 1, att. SS).

[64]Joint Ex. 16, at 9-10.

The recordings of Petitioner's phone calls from the Boone County jail to Ms. Devries and his calls from the ADC in 2009 further demonstrate his understanding of the proceedings.[65]  For example, he discussed speedy trial requirements with Ms. Devries, saying that if they did not get him to trial by a certain date, they would have to release him. He also tells her at one point that she should "forget" about the capital murder charge.  He also expressed concern about what they should discuss on the phone.

The next issue to be considered is whether Petitioner was able to assist in his defense.  Again, I do not find it reasonably probably that evidence of his mental problems would have changed that finding.   Trial counsel testified at the habeas hearing that although he was not concerned with Petitioner's competency, he was concerned about his mental capacity to assist in his defense.  It appears from the record and from counsel's testimony that they were able to have meaningful discussions about all the facts early in preparation.  Counsel testified that "some days" Petitioner would have trouble remembering issues they had discussed, but that they would go back over it and get back on track.  He said he was hindered mostly by having to go back over things they had already discussed.

On the other hand, under examination by Respondent's counsel in the habeas hearing, trial counsel testified that he talked with Petitioner several times getting ready for trial on the August charges and that Petitioner was able to relate his perceptions of events. Counsel said it was crucial to compare what the officers were saying about timing, what was being said and the events of the arrest with what his client told him.  Counsel specifically said that Petitioner gave him every detail, from his perspective, of how he came

---

[65]Resp't Ex. 48; Resp't Ex. 1, att. UU & VV.

into the parking lot, where he parked, what he did, how long he sat there.  He was able to do that and assist in the fact-intensive preparation of the defense on the attempted murder charge.  Counsel testified that Petitioner was the only person who could have given him the perspective of what happened.   The validity of counsel's testimony is bolstered by Petitioner's own hearing testimony on cross-examination.  Although he tried to say he had not assisted in his defense, he had to admit that he told counsel what had happened during the controlled buy, including such details as not being able to see behind him, that his car had high head rests, which made it hard to see over his shoulder, and that he was blind in one eye.  He admitted that he had related those facts in preparation for trial and that he and counsel had detailed conversations about exactly what happened and when, leading up to the point when the officer shot him.[66]  The evidence of Petitioner's ability to assist in his defense on this charge is a strong indication that he was also able to relate other details relevant to the defense on all charges.   His phone calls from the Boone County jail demonstrate he knew that his attire and appearance at trial were important, as was the presence of family members, especially his mother.

Counsel's testimony about Petitioner's ability to follow along at trial was rather vague and he did agree that, at times, Petitioner did not seem to follow what was happening and that Petitioner was more tuned to the visual than the actual testimony.  However, given the nature of the charges on which Petitioner was convicted, it is difficult to see how any inability to follow along disadvantaged the defense.  It is clear he possessed what was purported to be methamphetamine and the other items basing the convictions.  Under the

---

[66]Hearing Tr. Vol. 1, at 168-70.

circumstances of this case, that could be challenged only by attacking the validity of the lab analysis, which would be something counsel could (and did) do without the client's assistance at trial.   Petitioner's assistance would be more critical in defending the attempted capital murder charge, and the acquittal itself is a strong indication that he was able to assist in his defense.

The reports of Dr. Brazas, Dr. Watson and Dr. Moore all demonstrate that Petitioner was basically a reliable historian regarding his personal, work , criminal and health history, despite the fact that he could not remember the names of the doctors who had treated him several years earlier.  It follows that he would be able to relate the facts surrounding the two sets of charges involved in this case.  A recorded phone conversation Petitioner had from the ADC with an individual named John in 2009 also demonstrates that he was capable of remembering the circumstances surrounding his arrests and would have been able to communicate them to his counsel.[67]   Petitioner and John were discussing a newspaper article about his case which mentioned the amounts of methamphetamine seized as the result of his arrests.  They were discussing whether the paper could be sued for making false statements.  John said something about his not having the amount the paper stated and Petitioner responded that, no, he was "loaded" at the time of the buy and that he had a little over three quarters of a pound.[68]  If he remembered that kind of detail well after the event, it follows he would have remembered other details and been able to relate them to his attorney in preparation for trial.

---

[67]Resp't Ex. 1, att. VV.

[68]It appeared they misunderstood each other about which arrest they were discussing.

I note that Dr. Watson, in his report, stated that, while he was not offering an opinion on the issue, he was "raising concerns" as to Petitioner's current competence and his competence at the time of the trial.  He stated, "Currently, on a tool for the assessment of competency to stand trial, Mr. Plunk's significant deficits in language skills made it very difficult for him to comprehend questions related to his own legal circumstances.  As a result, his performance on that portion of the test was most consistent with individuals found incompetent to stand trial."[69]  Dr. Watson said he used the MacArthur Competence Assessment Tool.  Under cross-examination at the habeas hearing, he agreed that the MacArthur test itself has limitations and that there have been criticisms of it by a well-known forensic psychologist, although he made it clear that he did not agree fully with the criticisms.[70]  Dr. Watson went on to criticize Dr. Brazas' finding of average intellect.  Dr. Moore discussed the problems with Dr. Watson's interpretation of the MacArthur test, saying that on the first two sections, generalities of a person's roles in the courtroom and reasoning, Petitioner showed adequate capacity.  He said that Dr. Watson utilized the test in a manner on which it was not standardized, namely, on a person who was post-conviction, seeking relief, as opposed to a person who was going to trial.  Dr. Moore also

---

[69]Pet'r Ex. 4, at 43.

[70]In his testimony, Dr. Watson agreed that the test has been criticized as not adequately addressing the particular circumstances of the test-taker and has no internal check to evaluate whether the test-taker is malingering.  (Hearing Tr. Vol. 1, at 84-86.)  He later agreed that it is important to know how well the person taking the test understands the circumstances of his own case, but argued that the test uses vignettes because it is trying to gauge the capacity to think and reason.  He discounted the criticism that the language is too complex, saying that there is a lot of language at trial and that the test gets at the ability to reason, irrespective of the specific circumstances.  (*See id.* at 92-94.)

was critical of the fact that the test had no malingering or effort-testing component.[71]

While I have carefully considered this, the abilities Petitioner demonstrated in remembering the relevant facts important to his defense, as discussed above, substantially outweigh Dr. Watson's concern, which he agrees is based on an incomplete analysis. Further, as to the offenses for which he was found guilty or pleaded guilty to, the evidence of guilt was strong and structuring a defense to those would be something defense counsel could handle with minimal involvement of the client.[72]

Based on the above, I find that Petitioner has failed to carry his burden of showing a reasonable probability that there would have been different findings on competency at the time of the alleged events or competency to stand trial had his state-court counsel fully investigated Petitioner's mental condition and presented the evidence later developed by habeas counsel.

Petitioner contends that the full background information on his physical and mental impairments would have enabled him to obtain a better plea deal if that had been presented to the prosecution.  There were plea negotiations throughout the course of both cases in state court.  There was a very early written offer dated June 2, 2006, on only the April charges.  The evidence indicated that the total time to be served would have been twenty-four years.  The letter further required a fine and restitution of more than $15,000, payment of various costs, forfeiture of all items seized, and that Petitioner report to jail on the date of the plea.  The letter further stated that if he did not accept the plea the next week, the

---

[71]Hearing Tr. Vol. 3, at 445-51.

[72]This does raise concern as to his ability to understand the consequences of his guilty plea in *Plunk 1* and his agreement to the sentence that was to be imposed.  This is addressed in section (B)(5) of Part V of this recommended decision.

charges would be amended to charge him as an habitual offender and the case would be set for trial.[73]   Trial counsel cannot be faulted for not having investigated Petitioner's psychological background this early in the case.   He was hired in May and Petitioner was incarcerated in Missouri until mid-June.   Counsel testified that he considered the letter a standard early offer and was not in a position to recommend it.   That is reasonable as a tactic.   Despite setting an early deadline, the hearing record indicates that the offer stood through Petitioner's first appearance in Arkansas on June 23, 2006, and apparently stayed on the table at least until the next appearance on August 18, 2006.   However, counsel had been representing Petitioner only a little less than three months when Petitioner made his own situation infinitely worse by attempting to sell methamphetamine to the undercover officer on August 28, 2006.   I find that, as to this early offer, counsel's representation did not fall below the *Strickland* standard.

Further, given the serious nature of the charges and given the existence of a videotape showing the extended car chase, it is doubtful at this early stage that the prosecutor would have considered the psychological evidence sufficiently mitigating to have changed his plea demands. The video is damning.   The chase lasted for an extended period, going into Missouri, back to Arkansas and then back to Missouri.   Petitioner drove at high speeds through traffic, at times driving into oncoming traffic, passing on blind curves and yellow lines, and weaving through a parking lot.   His driving showed a complete disregard for the safety of others, and the skill exhibited is at complete odds with the picture

---

[73]Joint Ex. 11.   Petitioner contends that he was not told about this offer and that he would have accepted it had he been told.   This contention is discussed elsewhere in this recommended decision.

of a partially blind, physically and mentally challenged individual incapable of thinking fast.

As detailed later, there were plea negotiations throughout the pendency of both cases, culminating in the final seventy-two-year plea deal made after the guilt phase in *Plunk 2*. Counsel would have had adequate time during the course of the cases to investigate Petitioner's psychological background and to have used it in negotiations. Again, the question is whether there is a reasonable probability that Petitioner would have gotten a better deal had counsel done so.

The basic problem is that there were so many aggravating factors in play that seem to substantially outweigh any mitigating effect of Petitioner's impairments. He had at least four prior felony convictions. He was arrested with a significant amount of methamphetamine on both incidents. As stated, the car chase was a highly aggravating factor. There is no doubt the officers involved were incensed both because of the danger to them and to the public and because of the damage, expense and trouble incurred. While Petitioner was on bond on the first charges, he attempted the August 2006 sale of a pound and a half of methamphetamine and officials felt strongly that he should be charged with attempted capital murder. All pretrial plea offers required that he plead to this charge, and it is clear there was pressure from law enforcement on the prosecutor to push it. Mr. Bradford, the deputy prosecutor who began handling both cases after the August offenses, testified that, while drug charges usually did not involve so stiff a penalty, he felt in this case that a life sentence was justified. He said that he was always open to, and would have listened to, any mitigating factors advanced by the defense in negotiations, but stated that due to the seriousness of the charges, the evidence would have had to be compelling to

have any effect on his position.  He said that while he considers such evidence, that does not mean he would give it the same weight as would the defendant.

The final question is whether there is a reasonable probability that presentation of Petitioner's psychological background to the jury would have changed the sentencing outcome.   All of the same aggravating factors would have been relevant had a plea agreement not been reached and had the question of punishment been put before the jury. The prosecution was preparing to show the chase video from *Plunk 1* to the jury in the *Plunk 2* sentencing phase and no one has suggested that it would not be admissible, even if no guilty plea had been entered on *Plunk 1*.  The jury had just acquitted Petitioner on the attempted murder charge.  One of the things trial counsel emphasized in his closing was that Petitioner was unable to see with one eye.  The implication would be that he would have trouble seeing behind him and that his depth perception would be bad.  Yet, the jury would view Petitioner driving, with exceptional control of his vehicle.   The video demonstrates that he had the overall vision, peripheral vision and ability to react quickly enough to thwart police attempts to bump his vehicle and cause loss of control.  Petitioner was able to swerve when necessary to keep police from passing or forcing him off the road. While they were ultimately able to accomplish a vehicle immobilization maneuver, earlier attempts, as well as attempts to lay down spike strips, were successfully avoided by Petitioner.   Under the circumstances, even if the full history of Petitioner's mental impairments had been put before the jury, it is not reasonably probable that this evidence would have resulted in a better outcome.  I agree with trial counsel that there very well could have been a much worse result, such as a sentence of life imprisonment, which is what Mr. Bradford testified is the sentence he would have asked the jury to impose.

In sum, Petitioner has failed to establish that any unprofessional error in trial counsel's failing to fully investigate and utilize the evidence of his mental impairments makes it reasonably probable that the outcome of the proceedings would have been different.

    2.    <u>Failure to Pursue Cooperating-Witness Status</u>.

In Claims 2(A)(7) and (B)(4), Petitioner alleges that state-court counsel failed to explore and pursue cooperating-witness status for him in other federal and state investigations, that these failures constituted deficient performance and, had counsel rendered reasonably effective assistance in this regard, there is a reasonable probability that Petitioner would have received substantially less prison time as a cooperating witness. Specifically, Petitioner alleges that counsel failed to pursue cooperating-witness status for him in an ongoing federal investigation into the drug scheme of which Petitioner allegedly was a part, and further failed to discover and offer Petitioner's assistance in ongoing state prosecutions of two "major" participants in the drug scheme, Marty Matzenauer and Janice McTyer. Petitioner asserts that looking into these other investigations could have led to dismissal of his state charges in deference to a federal prosecution, or to a less severe sentence due to his assistance.

The hearing testimony and exhibits showed that, in 2006, the DEA and other law enforcement agencies were investigating Ms. Holt/McTyer and Mr. Matzenauer, and had information indicating that Ms. Holt/McTyer was obtaining methamphetamine from out of state and supplying it to lower-level distributors in Arkansas. Petitioner was believed to be one of those distributors, and Mr. Matzenauer was described as a "local dealer." One source told police in May 2006 that the three were "partners," but that Ms. Holt/McTyer was

actually "the person with the major connection for dope."[74]

Shortly after Petitioner's August 2006 arrest, DEA agents met with Boone County law enforcement officers and prosecutors to look at the possibility of using information provided by Petitioner to assist in their investigation of Mr. Matzenauer and Ms. McTyer. After the meeting, DEA decided not to interview Petitioner.   DEA Agent Brad Abbott explained that, because Petitioner had been shot by law enforcement in connection with the August arrest, they did not think he would be cooperative and, in any event, they had other witnesses to pursue and already had "a pretty decent case" against Ms. McTyer.

Mr. Bradford, one of the Boone County deputy prosecutors, testified at the federal habeas hearing that it was "always a possibility" that Petitioner would have received less prison time if he had provided information to the DEA, but it would have depended on the type of information provided and how successfully the DEA could have used it.   Another deputy prosecutor, Mr. Carter, testified that he did not think providing information on Mr. Matzenauer would have benefitted Petitioner because Mr. Matzenauer had already been convicted and more charges were pending.   He also said they believed Mr. Matzenauer was lower than Petitioner in the distribution chain and "if I make a deal with somebody, we go up, not down."   He said prosecutors "might" have considered making "a deal" with Petitioner if Mr. Matzenauer was not in custody and was still supplying drugs, if Petitioner was lower than Mr. Matzenauer in the distribution chain, if Petitioner wanted to talk to law enforcement, and if law enforcement then came to the prosecutors.

At the habeas hearing, counsel testified that he did not recall if he knew the DEA

---

[74]*See* Resp't Ex. 13, at 1, 4-6; Joint Ex. 21, at 211.

might be interested in Petitioner's case, but he said no one from the DEA or the United States Attorney's office ever contacted him with any interest in Petitioner's assistance.  He acknowledged that a Boone County investigator told Petitioner, in a custodial interview on August 30, 2006, that "the Feds or the DEA [were] eyeballing this case" and "this could go federal."[75]  Counsel said he would not have considered the investigator's statement to be true but rather viewed it as "a tactic of the interviewer" to "put some pressure on [Petitioner] to make a statement."

Counsel testified that he never contacted the DEA or other law enforcement agencies to offer Petitioner's assistance for several reasons: (1) the possibility that any sentence Petitioner would receive under the federal sentencing guidelines "could be worse"; (2) contacting law enforcement might place him (counsel) in the position of being a witness; (3) such contact had the potential for something being "tipped off" about Petitioner and his defense; (4) such contact could expose information that was protected by the attorney-client privilege; (5) Petitioner never indicated he was interested in cooperating with law enforcement; and (6) cooperation or acting as an informant could become life-threatening.

Petitioner testified at the habeas hearing that he knew Mr. Matzenauer and Ms. McTyer were drug dealers and would have told counsel information about their business if asked and if counsel had explained that sharing the information might have helped his case.  However, he testified that the one time counsel asked about Mr. Matzenauer, Petitioner "didn't know really what to say" and "kind of blew it off," and that counsel never

---

[75]Joint Ex. 15, at 9.

asked again.   In an interview with police shortly after his April 2006 arrest, officers repeatedly attempted to elicit information from Petitioner about his superiors and associates and told him, if he cooperated, they would tell the prosecutors that he tried to help. Petitioner refused to provide any information.[76] In a custodial interview on August 30, 2006, he again refused to provide any information to law enforcement that "would help you and help us."[77]

Exhibits were admitted reflecting past and pending criminal proceedings involving Mr. Matzenauer and Ms. McTyer in several counties in Arkansas, and in other states.[78]

The reasons advanced by counsel are valid and objectively reasonable explanations for his failure to pursue cooperating-witness status with the DEA or other law enforcement agencies.  Significantly, Petitioner never expressed an interest in providing assistance and, when asked by counsel about Mr. Matzenauer, admitted that he "blew it off."  Similarly, he flatly refused to provide any information to investigators when asked.  No evidence was introduced specifying what information Petitioner could have provided, much less whether he had any material information which would have been helpful to law enforcement.  The prosecutors stressed that any "deal" or sentencing concession would have depended on a number of factors: the type of information provided, how successfully that information could have been used by law enforcement, and the relative roles of Petitioner and the other individuals in the distribution scheme.  As discussed earlier, other evidence in the record

---

[76]Joint Ex. 14, at 5-10.

[77]Joint Ex. 15, at 6-7, 10.

[78]Pet'r Ex. 16-23.

shows that, within a short time after Petitioner was first arrested, investigators already knew a great deal about the other individuals involved in the drug trade.  The evidence also fails to demonstrate that Petitioner actually would have been willing to cooperate with law enforcement – or that such cooperation would have been advisable – in light of the risks and other circumstances involved.

Petitioner has failed to establish that counsel's failure to explore cooperating-witness status fell outside the wide range of reasonable professional assistance, or a reasonable probability that, had counsel performed differently, the result of his criminal proceedings would have been different.

       3.     <u>Failure to Challenge Forensic Evidence</u>.

Petitioner alleges that counsel failed to file a motion to suppress or motion in limine with respect to the methamphetamine seized from his truck following the April arrest in *Plunk 1* (Claim 2(A)(11)); and failed to object to admission of the drug analyst's report or effectively contest the forensic evidence presented at the *Plunk 2* trial (Claim 2(A)(12) & (13)).  He asserts that, had counsel acted effectively, the trial court would have been required to exclude the state's forensic evidence, and he thus would have been acquitted or would have received a significantly better plea offer (Claim 2(B)(5) & (9)).

In support, Petitioner alleges that, in *Plunk 1*, counsel should have challenged the seizure of the large amount of drugs from his truck on the basis that there was a significant amount of time between his April 24 arrest and the discovery of the additional drugs on May 2, during which his truck was kept in an unsecured impound lot.  He also asserts that, in the *Plunk 2* trial, counsel gave the state's forensic evidence "no vetting," failed to raise a Confrontation Clause challenge to the admissibility of the lab report because the chemist

who performed the tests was not present at trial, and failed to adequately challenge the testing done by the crime lab.

Regarding the drugs found in his truck in *Plunk 1*, Petitioner has failed to show that counsel's conduct was deficient, or a reasonable probability that, had he raised a challenge, it would have been successful.  At the habeas hearing, counsel was not asked about any strategies regarding the methamphetamine seized in *Plunk 1*.  In any event, it was objectively reasonable for him to focus on the *Plunk 2* charges that occurred in Arkansas and were being tried first, rather than attempting to track down factual details regarding the search that occurred in Missouri.  Furthermore, the search of Petitioner's impounded vehicle was supported by information supplied by an informant, and a positive canine sniff.[79]  Although Petitioner suggested in his pleadings that the evidence could have been excluded because the impound lot was not secured, there was no evidence regarding the security of the lot, much less anything indicating that anyone could have entered the lot or tampered with Petitioner's vehicle.  There is no evidence that any of the substances at issue were not illicit drugs.  Petitioner's assertions on these issues remain only allegations, unsupported by any evidence.  Even if the drugs found in his truck could have been suppressed, counsel's advice to plead guilty to possession with intent to deliver was nevertheless reasonable due to the amount of methamphetamine found on the roadways along the pursuit route, four grams, which is well above the amount necessary under Arkansas law to create a rebuttable presumption of intent to deliver.

Regarding *Plunk 2*, the trial transcript shows that counsel raised a variety of

---

[79]Resp't Ex. 13, at 4-5; Resp't Ex. 20; Joint Ex. 21, at 211.

challenges to the state crime lab documents and the testimony of a state chemist and an officer in the chain of custody.  For example, he presented three arguments to exclude notes from a different chemist who actually performed the drug analysis but was not present to testify: (1) as inadmissible hearsay, (2) as a Confrontation Clause violation, and (3) as a discovery violation, in that the document was provided to counsel on the second day of trial.  Counsel was successful in preventing admission of the absent chemist's notes; however, the crime lab report itself was admitted.[80]  Counsel also repeatedly objected to testimony from the testifying chemist on the basis that she lacked personal knowledge of matters related to testing of the particular substances, and for other reasons.  Several of those objections were sustained.[81]  In addition, counsel objected to admission of the state crime lab report and other documents due to the state's failure to prove a sufficient chain of custody.  This challenge was unsuccessful; however, the trial court permitted counsel to cross-examine and, in overruling the objections, stated that any possible break in the chain could be argued to the jury.[82]  In all, counsel engaged in at least three bench conferences regarding the forensic evidence in *Plunk 2*, made at least fifteen objections, and carefully cross-examined the testifying chemist and officer.

Trial counsel testified at the habeas hearing that the state's presentation of the crime lab evidence came at the end of the second day of trial and that, the following day, the state called an additional witness and recalled the crime lab chemist.  He said he felt he "was getting real close" to successfully excluding the evidence and then the state was given

---

[80]Joint Ex. 4, at 391-93, 428-38, 472-74, 495.

[81]*Id.* at 80-83, 485, 488-89, 490-95, 507, 515.

[82]*Id.* at 454-57, 571, 495, 507-15.

"an opportunity to bolster what they were doing" to establish chain of custody.

The evidence thus abundantly demonstrates that counsel vigorously – and with some success – challenged the evidence and testimony related to the state crime lab documentation and testing procedures. This is particularly true in light of the fact that he was not provided with some of the documents until the second day of trial, despite having requested it in discovery.

Moreover, the United States Supreme Court did not definitively settle the admissibility of lab reports prepared by analysts unavailable for trial until two years after Petitioner's trial, in *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009). Counsel is not ineffective for failing to anticipate later decisions or developments of the law. *New v. United States*, No. 10-2308, 2011 WL 3820826, at *3 (8th Cir. Aug. 31, 2011) (attorney's failure to raise arguments that require the resolution of unsettled legal questions generally does not render his services "outside the wide range of professionally competent assistance" sufficient to satisfy the Sixth Amendment); *Sasser v. Norris*, 553 F.3d 1121, 1127 (8th Cir.)*, cert. denied*, 130 S. Ct. 397 (2009); *Parker v. Bowersox*, 188 F.3d 923, 929 (8th Cir. 1999).

In addition, the evidence in the record fails to demonstrate a reasonable probability that, even if counsel had performed differently, the outcome of Petitioner's trial in *Plunk 2* would have been different.

4.   Failure to Communicate and Adequately Advise Regarding Pretrial Plea Offers.

In Claim 2(A)(9), Petitioner alleges that counsel failed to communicate pretrial plea offers and adequately advise Petitioner regarding those offers, which constituted deficient

performance. (Counsel's conduct in connection with the final plea agreements is discussed separately.)

The record contains evidence of at least three pretrial plea offers: (1) a twenty-four-year offer on the April charges only; (2) offers of aggregate sentences of 100 years to life, on the April and August charges; and (3) a "package" deal for both Petitioner's and Ms. Devries' charges.

First, as mentioned earlier, in June 2006 – after the April arrest but before the August arrest – Mr. Carter extended a plea offer of twenty-four years on the April charges, with the additional offer to not charge Petitioner as an habitual offender. It required Petitioner to pay over $15,000 in fines and restitution for damage to police vehicles, forfeit all seized items, and report to jail on the day of the plea. Mr. Carter testified that this was a "very serious" offer because, at the time, Petitioner was still detained in Missouri and the prosecutors wanted to resolve the Arkansas charges early on and hopefully get him to plead at his initial appearance. The terms were set forth in a letter dated June 2, 2006.[83]

On June 23, 2006, Petitioner appeared in Boone County Circuit Court for plea and arraignment, and he was released on bond. The transcript does not reflect any on-the-record discussion of a plea offer. On August 18, 2006 – still before the August arrest – counsel and Petitioner again appeared in Boone County Circuit Court, and counsel stated that the prosecutor (at that time, still Mr. Carter) had extended "a proposed resolution,"

_____

[83]The letter (Joint Ex. 11) offers: twenty-four years each on the charges of possession with intent to deliver and simultaneous possession of drugs and firearms; ten years each on the charges of fleeing, possession of drug paraphernalia, and criminal mischief; and six years on the aggravated assault charge. The letter does not state that the sentences would run concurrently; however, the habeas hearing testimony indicates that was the intent.

which they were reviewing.[84]

At the habeas hearing, counsel was not asked about the twenty-four-year plea offer. In his pre-hearing deposition, counsel stated that he considered the offer a "gesture" on the prosecutor's part, rather than a formal offer, and that Mr. Carter "likes to make these plea offers early on" and was "kind of tipping his hand where he's at, you know, without me even having full discovery." He said he remembered specifically discussing the twenty-four-year offer in his office with Petitioner after his release, explaining that it was the just the "first shot across the bow" and advising him that they needed to "buy some time."   He said Petitioner understood this was an initial-type offer and wanted counsel to "keep working."[85]

Petitioner testified at the habeas hearing that he did not get any plea offers in his first case that he remembered, did not know anything about a twenty-four year deal, and would have taken that deal if he had been told about it.  During a psychological evaluation on April 17, 2007, Petitioner told the psychologist that he had been offered "20 to 40 years" for both the April and August charges and that "they later came back and offered him 100 years."[86]

I find that counsel informed Petitioner about the twenty-four year plea offer sometime between his release on bond on June 23, 2006, and the state court appearance on August 18, 2006.  Counsel's reference to a pending "proposed resolution" offered by Mr. Carter had to be to the twenty-four-year offer as there was no evidence of any other pending plea offers at the time.  The transcript clearly shows that Petitioner was present during the court

---

[84]Joint Ex. 5, at 2-4.

[85]Joint Ex. 1, at 116-25, 135-40.

[86]Joint Ex. 16, at 9.

appearance, undermining his testimony that he had no knowledge of any plea offers on his April charges.  In addition, Petitioner's reference to a "20 to 40" year offer indicates that he was aware of lesser offers preceding the later-extended offers.

I further find that, in light of the information then available to counsel, he reasonably advised Petitioner that this was a preliminary offer and that they should keep working toward a more favorable resolution on his April charges.  Petitioner was free on bond, and the offer required him to report to jail immediately upon pleading.  He has not shown that he could have met the financial obligations required by the offer.  The offer did not specify concurrent imprisonment terms. Both sides were still in the early stages of discussion and discovery of evidence.  Counsel was familiar with the local prosecutor and his plea negotiation tactics.  Of course, counsel had no idea at the time that Petitioner would shortly engage in conduct leading to additional, more serious, criminal charges, which would significantly change the plea bargaining landscape.  Moreover, in light of the conditions set forth in Mr. Carter's letter and the circumstances cited above, Petitioner has not established a reasonable probability that he would have accepted all the terms of this initial plea offer.

The next plea offers in the record were extended by Mr. Bradford, who took over as the prosecutor on both of Petitioner's cases following his August arrest.  These offers encompassed both cases.[87]  Basically, they entailed Petitioner's pleading guilty to all charges from the April and August arrests and receiving an aggregate sentence of either life or 100 years.  As discussed earlier, there was also evidence regarding negotiation of a "package deal" for Petitioner and Ms. Devries. On February 17, 2007, Mr. Bradford wrote

---

[87]Resp't Ex. 11 contains the unsigned plea statements.  Some have an acceptance deadline of January 12, 2007, and some are undated.

a letter to Petitioner's counsel as a follow-up to an earlier discussion, stating, "Pursuant to the negotiated plea of Terry Plunk, the State of Arkansas shall extend an offer of probation to Deborah Devries."  Mr. Bradford testified that the probation offer was contingent on Petitioner's pleading guilty to the attempted capital murder and receiving a life sentence. They were unable to reach an agreement because, according to Mr. Bradford, counsel asked if they could work out a deal that did not involve a plea to the attempted capital murder and the state was not in a position to *nolle pross* that charge or exclude it from the negotiations.  At the habeas hearing, counsel testified that Petitioner "wanted to fight [the attempted capital murder charge] all the way" and would not entertain a guilty plea to that charge under any circumstances.  Petitioner testified at the hearing that, one time, counsel tried to get him to take a ninety-nine-year deal "that would make it better for Deb, she could probably get probation."  Petitioner said no.  He admitted that he would not take any plea deal that involved pleading guilty to the attempted capital murder.

The testimony from all witnesses was consistent regarding these later pretrial plea offers: Petitioner was adamant that he would not consider a plea to the attempted capital murder.  Further, all of the offers involved sentences of life or 100 years, substantially more than the seventy-two-year sentence he ultimately received.  Petitioner simply has not shown a reasonable probability that, if counsel had better communicated or more thoroughly discussed these offers with him, he would have accepted any of them.

5.    Failures in Connection with Final Plea Agreements.

Petitioner alleges that counsel unreasonably advised him to plead guilty and to stipulate to a seventy-two-year sentence without meaningful investigation or preparation (Claim 2(A)(14)); failed to advise him about parole eligibility under the plea agreements

75

(Claim 2(A)(9)); and unreasonably allowed him to believe he would face a life-without-parole sentence and never see his mother again if he did not plead guilty and stipulate to the sentence, and that he would be out of prison in five years if he accepted the offered plea deal (Claim 2(A)(15)).  He alleges that, had he been properly advised, he would have refused to plead guilty on the *Plunk 1* charges and would have insisted on a trial, and would not have accepted the seventy-two-year stipulated sentence in *Plunk 2* and instead would have insisted on sentencing by the judge or jury (Claims 2(B)(10) & (11)).

I find that it was objectively reasonable for counsel to advise Petitioner to waive sentencing by the judge or jury and agree to a seventy-two-year imprisonment term on the August offenses in *Plunk 2*.  As already discussed in connection with other arguments, counsel could sense the disappointment from the prosecutors and law enforcement due to the attempted capital murder acquittal, and accurately believed that prosecutors would push for the maximum sentence.  Substantial imprisonment terms were at stake.  As a Class Y felony, the possession with intent to deliver charge carried a maximum penalty of life imprisonment.  Because Petitioner was an habitual offender with more than four prior felony convictions, as well as a prior drug-related conviction, he was subject to significantly enhanced sentences on both charges.

In determining an appropriate sentence, the judge or jury would hear about Petitioner's criminal history.  The judge or jury would hear that he committed the August offenses while out on pretrial bond for other pending charges.  The judge or jury would view the video showing reckless behavior and exceptional driving skills for someone with one eye.  Counsel understandably feared that the jurors might regret acquitting him on the attempted capital murder charge.  There was a palpable possibility that, to compensate,

76

they might give him a lengthy sentence or that the sentences would be run consecutively.

Of even greater concern was the looming prospect of a later trial and sentencing on the April charges in *Plunk 1*.  It was objectively reasonable for counsel to negotiate, and advise Petitioner to agree to, a disposition that encompassed those charges.  Counsel knew that, after a partial loss on the August charges, prosecutors and law enforcement would intensify their efforts to ensure convictions and severe imprisonment terms on the April charges.  They would do so armed with the high-speed pursuit video, which was formidable and virtually indefensible evidence of guilt on the fleeing and criminal mischief charges, as well as incendiary evidence of reckless behavior endangering law enforcement and the public.  There also was little to defend Petitioner against the possession with intent to deliver charges, based on the amounts of methamphetamine thrown from his vehicle. This was enough to prove intent under Arkansas law, even without being bolstered by the substantial amounts of methamphetamine found later in his truck.  Conviction thus was highly probable on at least these charges.

In determining the appropriate sentence for the April charges, the jury would take all the circumstances into account and would also be informed that, while he was out of bond for the charged offenses, he continued to engage in illegal behavior by arranging the August sale of a substantial amount of drugs, albeit to an undercover officer.  The jury would learn that he had been convicted of those later offenses, padding his history of drug-related felony convictions.  All in all, the probability existed of a significant sentence, possibly life imprisonment and possibly to be served consecutively to his existing sentences for the August convictions.

Under these circumstances, the bargain struck – concurrent, seventy-two year

imprisonment terms for all offenses – was not unreasonable and counsel should not be second-guessed for advising Petitioner accept it rather than face the uncertainties inherent in sentencing by the judge or jury on the convicted offenses and a later trial on the remaining charges.

Petitioner testified at the habeas hearing that he agreed to plead guilty because his counsel convinced him he "would get out in five years" if he took the plea bargain and also promised to file a lawsuit on his behalf against the police officer who shot him.  He said counsel "hammered" him about taking the deal and said, if he did not take it, he would face two life sentences and would never see his mother again.

Counsel testified that Petitioner was "having some trouble" understanding the plea agreements but he "went over and over" the terms with him and that, when they appeared before the judge, Petitioner said he understood everything.  The plea hearing transcript shows that the trial judge reiterated the essential terms of the plea agreements and that Petitioner acknowledged his understanding and asked no questions.  Counsel said he did not tell Petitioner when he would be eligible for parole.  He said he always tells his clients that he cannot give them anything certain on that, just a "best guess or estimate," and that when they get to the ADC, parole eligibility will be calculated based on prior convictions, severity of the offense, and other matters.  He said he "never bind[s] [him]self," just telling them "that will be calculated."

Counsel testified that he never promised Petitioner anything.  Counsel said he did tell Petitioner that he would try to find an attorney to file a lawsuit over being shot but said he could not provide representation because he had no expertise in that area.   According to counsel, the conversation they had the day of the plea hearing was that Petitioner

needed to apply for clemency or something of that nature "after he'd been there probably four or five years." He said Petitioner never said he believed anything different, they went over the plea offer in detail and that was never discussed, and Petitioner never raised it with the judge.

I find that counsel's testimony was credible and that he did not promise Petitioner he would be out of prison in five years if he accepted the plea offers.

Nor did he act unreasonably in failing to advise Petitioner about his prospects for parole eligibility. The United States Supreme Court has expressly declined to determine whether there are circumstances under which erroneous advice by counsel as to parole eligibility may be deemed constitutionally ineffective assistance of counsel. *Hill*, 474 U.S. at 60; *see Buchheit v. Norris*, 459 F.3d 849, 852 (8th Cir. 2006). Moreover, at the time counsel represented Petitioner, the law in the Arkansas state courts and the federal courts distinguished between non-advice from counsel about parole eligibility and affirmative misadvice about parole eligibility specifics. *See Buchheit*, 459 F.3d at 851, 853; *Buchheit v. State*, 6 S.W.3d 109, 110-12 (Ark. 1999);

Petitioner cites *Padilla v. Kentucky*, 130 S. Ct. 1473 (2010), for the proposition that reasonable professional assistance includes "providing the defendant with accurate information and reasonable advice bearing on the defendant's decision whether to accept a plea offer made by the State" (doc. 159, at 25). *Padilla* held that a trial attorney engaged in deficient performance by failing to advise a defendant that his guilty plea made him subject to automatic deportation. Although the *Padilla* majority focused on the "unique nature of deportation," *id.* at 1481, there is some recent authority for extending its holding beyond the deportation/immigration context, including failure to advise about parole

79

eligibility. *See, e.g., Jacobi v. Commonwealth*, No. 2009-CA-001572, 2011 WL 1706528, *3-*4 (Ky. Ct. App. May 6, 2011) (extended *Padilla* to hold that trial counsel's gross misadvice or non-advice concerning parole eligibility may amount to ineffective assistance of counsel); *Booth v. State*, No. 37296, 2011 WL 3191545, *6 (Idaho Sup. Ct. July 28, 2011) (under *Padilla*, attorney engages in deficient performance by rendering advice regarding potential penalties during plea process that is inconsistent with unambiguous provisions of sentencing statute).   Moreover, *Padilla* rejected the distinction between affirmative misadvice by counsel as opposed to a failure to advise.  *Padilla*, 130 S. Ct. at 1484.  Additionally, the Courts of Appeal are split on whether *Padilla* should be retroactively applied to cases on collateral review.  *Cf. United States v. Hong*, No. 10-6294, 2011 WL 3805763, at *2-*10 (10th Cir. Aug. 30, 2011) (*Padilla* does not apply retroactively on collateral review); *Chaidez v. United States*, No. 10-3623, 2011 WL 3705173, at *2-*8 (7th Cir. Aug. 23, 2011) (same); *with United States v. Orocio*, 645 F.3d 630, 641 & n.10 (3d Cir. 2011) (*Padilla*'s holding is retroactively applicable on collateral review).

While *Padilla* and its still-developing effects could change the legal landscape regarding the scope of counsel's constitutional duties in a guilty-plea context, the law at the time of Petitioner's pleas did not require attorneys to advise their clients about the specifics of parole eligibility, and, in fact, discouraged them from doing so.  As stated, attorneys do not act incompetently in failing to anticipate changes in the law.  Therefore, it was not objectively unreasonable for counsel to decline to give Petitioner any specific advice about his prospects for parole eligibility.

Even if counsel unreasonably failed to advise Petitioner regarding when he would be eligible for parole, Petitioner has failed to show a reasonable probability that, if he had

been differently advised, he would have insisted on sentencing by the judge or jury in *Plunk 2* and would have pleaded not-guilty to the *Plunk 1* charges and insisted on going to trial. No one has established when Petitioner will be eligible for parole under Arkansas law.  The ADC[88] website gives the date as March 10, 2025, *i.e.,* eighteen years from his 2007 convictions.  Under all the circumstances discussed in this recommendation, Petitioner has not established that, if he had known he would be eligible for parole in eighteen years (rather than five), he would have instead opted to reject the negotiated plea agreements and placed his fate in the hands of the judge or jury, realistically risking a term of life imprisonment.  His self-serving, after-the-fact statements now are inadequate.

I am concerned that, regardless of what Petitioner actually was told by counsel, Petitioner nevertheless misunderstood and mistakenly believed that he would be eligible for parole in five years.  I also am not entirely convinced that, due to his mental limitations and the need to make a decision quickly, Petitioner fully understood the details of the plea deal.  However, it is well established that "[w]here, as here, a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" *Hill*, 474 U.S. at 56.  Such a defendant "may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann* [*v. Richardson*, 397 U.S. 759 (1970) ]," as reiterated in *Strickland* and *Hill*.  *Hill*, 474 U.S. at 56-57.

---

[88]www.adc.arkansas.gov.

I find that counsel's advice to Petitioner to agree to the stipulated sentence in *Plunk 2*, and to plead guilty to the charges and negotiated sentence in *Plunk 1*, was within the range of competence demanded of attorneys in criminal cases and was objectively reasonable under the circumstances.  Furthermore, the record, as set forth above, shows that counsel adopted a sound trial strategy, extensively prepared for trial, and invested substantial effort and resources in Petitioner's defense, with some significant success. While this is in a sense not directly relevant on the question of what trial counsel did not do, it does tend to show that he worked hard on the case and gave his best efforts.  To me, it supports his credibility overall and supports his contention that, despite the fact that Petitioner "ran out of money" for the defense, counsel continued to act in Petitioner's best interest, defending him vigorously, and would have done so in any subsequent proceedings.  Given this, I feel it likely that trial counsel did not try to force him to plead and waive sentencing out of personal financial motives, but rather counseled him out of a legitimate concern that the outcome would have been much worse.

Other evidence undercuts Petitioner's assertion that he was coerced or "bullied" by counsel into pleading guilty.  In his state court proceedings, the trial court explained to Petitioner his pleading options and the sentencing possibilities, the court explained to Petitioner what he was giving up by pleading guilty, Petitioner admitted on the record that he did indeed understand his choices and the charges and range of possible penalties, and he at no time expressed any confusion with the proceedings or dissatisfaction with his attorney.  He acknowledged that he was pleading freely and voluntarily.  These "[s]olemn declarations in open court carry a strong presumption of verity," which is not easily defeated by "self-serving, post-plea claims" that he did not voluntarily plead guilty.  *See*

*United States v. Green*, 521 F.3d 929, 932 (8th Cir. 2008); *Porter v. Lockhart*, 925 F.2d 1107, 1111 (8th Cir. 1991) (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)). Additionally, Petitioner's refusal to provide information or otherwise cooperate in his two custodial interviews, despite intense questioning by law enforcement officers, indicates that he was not readily swayed by persuasive tactics.

      6.    Remaining Claims.

      Aside from the specific areas identified above, Petitioner alleges, generally, that counsel failed to investigate the facts of the case or try to hire a private investigator. (Claims 2(A)(4) and part of 2(A)(7)).  Counsel admitted that, in preparing for trial, he interviewed only Petitioner, his mother and Ms. Devries, and did not hire a private investigator or move for funding to do so.  However, as discussed elsewhere, I find that counsel's overall trial strategy and preparation were objectively reasonable under the circumstances, and Petitioner has failed to identify any other specific deficiencies on counsel's part which, with reasonable probability, could have affected the outcome of his proceedings.

      Petitioner also presents several ineffective-assistance claims related to his joint representation: that counsel unreasonably failed to warn Petitioner about the hazards of joint representation and suppressed important information from him (Claim 2(A)(1)); unreasonably used Petitioner's limited funds to benefit Ms. Devries (Claim 2(A)(2); unreasonably failed to seek appointment of another attorney or have Petitioner declared indigent so that court funds could be used to fund his legal representation (Claim 2(A)(3)); and unreasonably sought leniency for Ms. Devries at the expense of strict sentence for Petitioner (Claim 2(A)(8)).  These were discussed above, generally, in connection with his

conflict-of-interest claims. Having failed to demonstrate an adverse effect from this conduct under *Cuyler*, he is necessarily unable to prove prejudice under *Strickland*'s more demanding prejudice standard.

      7.    <u>Summary</u>.

      In sum, I find that Petitioner has failed to establish that he is entitled to relief on any of his claims of ineffective assistance of counsel. As discussed, some of them fail because counsel's conduct did not fall below an objective standard of reasonableness, others fail because he has not shown a reasonable probability that the result of his proceedings would have been different, and several fail for both reasons.

## VI.
## <u>CONCLUSION</u>

      For the reasons set forth above, Petitioner's claims are without merit. Therefore, this 28 U.S.C. § 2254 petition for writ of habeas corpus, as amended (docs. 2, 9, 86), should be **denied, dismissing this case in its entirety with prejudice.**

      When entering a final order adverse to a federal habeas petitioner, the Court must issue or deny a certificate of appealability. Rule 11, Rules Governing § 2254 Cases in United States District Courts. A certificate of appealability will issue only if the petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(1)-(2). I find that Petitioner has made a sufficient showing to be entitled to a certificate of appealability. Because the issues he has raised are intertwined, I further recommend that the certificate of appealability be granted as to all of his claims.

      DATED this   20th   day of September, 2011.

_____
UNITED STATES MAGISTRATE JUDGE